[No. B209614. Second Dist., Div. Six. Oct. 29, 2009.]

THE PEOPLE, Plaintiff and Appellant, v.
CHAD JOSEF MEDLIN et al., Defendants and Respondents.

## Counsel

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan Sullivan Pithey and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Appellant.

Wasserman, Comden & Casselman, Mark S. Gottlieb, Leonard J. Comden and Louis Samonsky, Jr., for Defendants and Respondents.

## Opinion

**COFFEE, J.**—The People of the State of California appeal from an order finding registered nurse Chad Josef Medlin and licensed vocational nurse (LVN) Sandra Marie Monterroso factually innocent of felony charges of dependent adult abuse likely to produce great bodily harm or death in violation of Penal Code section 368, subdivision (b)(1).[1] The order followed their acquittal by jury. The court directed destruction of records of their arrests pursuant to section 851.8, subdivisions (b) and (c). We issued a writ of supersedeas staying the destruction of records pending appeal.

Appellant contends that, notwithstanding the acquittals, reasonable cause exists to believe that respondents committed the offense of which they were charged. We agree and reverse.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

## FACTUAL AND PROCEDURAL BACKGROUND

Jeremiah Allen nearly drowned in a surfing accident in October 2003. He was rendered semicomatose and paraplegic. In January 2004, he was admitted to CareMeridian, a long-term care facility at which respondent Medlin was director of nursing and Monterroso was employed as an LVN. CareMeridian is a 12-bed facility that specializes in accident victims. It was about half full while Allen was there. Allen died at the facility on the afternoon of June 2, 2004, because his tube feedings had been introduced into his abdominal cavity instead of his stomach.

### Events Leading to Allen's Death

From the time of his accident, Allen had been fed with a size 20 gastrostomy tube, or "G-tube." A G-tube passes directly into the patient's stomach from his belly, through the abdominal cavity, bypassing the esophagus. Standing physician's orders called for a size 14 French G-tube and authorized G-tube replacement if the tube became blocked (occluded) or was pulled out. By the time of trial it was clear that the discrepancy in tube size did not contribute to Allen's death.

On June 2 at 3:00 a.m., Monterroso found Allen's G-tube lying beside him on the bed. She did not know how long it had been out. She noted in his chart that he had pulled it out forcibly, but she did not see that happen. She did not call Allen's physician or alert Medlin, and she did not check the standing orders. She had not recently been trained in G-tube placement.[2]

Monterroso replaced the G-tube. She used two methods to try to verify that she had placed the tube in the stomach. First, she used a stethoscope to listen to air passing from a syringe into the stomach (auscultation) and heard a whooshing sound in the abdominal area. Next, she unsuccessfully attempted to aspirate (pull up) gastric fluids. From the absence of gastric fluid, she concluded Allen's stomach was empty.

Monterroso proceeded with Allen's scheduled feedings after 3:00 a.m. and again at 6:00 a.m. She reported in his chart that he tolerated his 3:00 a.m. feeding well, but in the medication checkout record she noted that about 4:00

---

[2] According to facility records, Monterroso had demonstrated competency in G-tube replacement in 1998. She was terminated from the facility in 1999 for "patient abandonment/failing to report to work." She was rehired in 2000, although her personnel records indicated that she was ineligible for rehire.

a.m. she gave Allen ibuprofen for "discomfort with G-tube removal" and Ativan for "G-tube reinserted, (increased) anxiety." She did not recall any problems with the 6:00 a.m. feeding.

After his 3:00 a.m. feeding, Monterroso noted that Allen was sweating, grimacing and groaning. She testified that she was not concerned because she had seen him sweat, grimace and groan before. She left her shift at 7:00 a.m. without notifying Allen's physician or Medlin of Allen's condition. She did inform the morning LVN, Patsy Carper, that she had replaced Allen's feeding tube. Before Monterroso left Allen appeared restful to her.

Carper observed that Allen was sweating and straining. She testified that he always sweated and strained before having a bowel movement. Carper had worked at the facility for two weeks and had not completed orientation. Before giving Allen his medications and morning feeding, Carper tried to aspirate gastric fluids to ensure that the G-tube was in the stomach. She got "very little contents." She concluded that this was because Allen had not had a bowel movement. She later told a State Department of Public Health (DPH)[3] investigator that the 9:00 a.m. feeding "went down slowly," but that she was able to complete it after she got him upright on a tilt table.

About 7:00 a.m., certified nursing assistant, Lazara Lozano, took Allen's vital signs. She noticed that Allen was pale and felt that something was wrong. She had not seen him this way before. She had cared for Allen since his arrival at the facility six months earlier.

Medlin arrived at the facility sometime after 9:00 a.m. About 10:00 a.m., Lozano and another staff member put Allen in a therapeutic standing frame. Lozano saw that he was breathing fast and perspiring. Allen's therapist saw that he was pale, sweating profusely and his eyes were wide open whereas they were usually closed. The therapist was new at the facility and had treated Allen only once before.

Staff returned Allen to his bed to rest before a scheduled therapy session. Lozano told LVN Carper what had happened. The therapist continued checking on Allen during the morning and Allen continued to sweat profusely.

Sometime between 11:00 a.m. and noon, Lozano took Allen's vitals. He had a fever over 101 degrees. She tried to take his blood pressure but could not hear anything. Another staff member tried and also could not hear

---

[3] The functions of the former State Department of Health Services were transferred to the new State Department of Public Health in 2007, after Allen's death and before trial. (Health & Saf. Code, § 131050, added by Stats. 2006, ch. 241, § 34, eff. July 1, 2007.) For simplicity, we will refer to both agencies as the DPH.

anything. Lozano told the morning nurse that Allen had a fever, she could not get his blood pressure and he was pale and did not look good. Lozano used ice to try to cool Allen.

About 11:00 a.m., Carper asked Medlin to check Allen because he was sweating. Medlin entered Allen's room. Carper told Medlin that Lozano could not hear Allen's blood pressure, but that it was fine because she, Carper, was able to get his blood pressure using palpitation. Medlin, who was sick with a cold, left the room and returned sometime before 1:00 p.m. When he returned, he said, "Oh, he's fine. He's probably competing with me."

Between 11:30 a.m. and noon, Medlin spoke by phone with Allen's treating physician about a routine meeting. Medlin did not mention Allen's condition.

By 1:30 p.m., Allen's temperature was 101.2. Carper reported this to Medlin. She gave Allen ibuprofen.

Sometime during the afternoon a friend of Allen's came to visit. Allen's eyes were wide open and he looked desperate. Allen's eyes were usually closed. The friend had visited several times before for about an hour each time. He called for help and nurses came in and said, "[Y]ou have to leave now."

About 1:00 p.m., Allen's physician received a message that Medlin was trying to report a change in Allen's condition. The physician called Medlin's cell phone between 1:00 p.m. and 1:15 p.m. Medlin told the physician that Allen's pulse was under 60 and his oxygen saturation levels had dropped dramatically. Medlin did not tell the physician that Allen's G-tube had been changed. The physician told Medlin that Allen needed to be sent to the emergency department.

Dispatch records showed that facility staff called an ambulance company about an hour later, at 3:21 p.m., requesting a routine transfer of a patient with fever. The call did not come through 911 and there was no dispatch note that transfer was urgent.[4] Paramedics arrived within eight minutes at 3:29 and found Allen dead. They reported that he had rigor mortis in the jaw, his skin was cold and he had lividity. These signs indicated that he had been dead for at least half an hour. Nurses were trying to help Allen breathe with a bag device when the paramedics arrived.

---

[4] The physician testified that he expected Medlin to call 911. He did not specifically instruct him to.

Medlin told a DPH investigator that he first learned of Allen's deteriorating condition between 11:00 a.m. and noon. He corrected that time to 1:45 p.m. after he reviewed notes. He said he first called Allen's physician at 2:30 p.m., staff called the ambulance twice, and it arrived about 2:45 p.m. Medlin said he did not tell staff to call 911 because he did not think Allen's condition was that bad. He said Allen's condition changed just as the paramedics walked in.

An autopsy determined that Allen's cause of death was peritonitis: an infection of the lining of the abdominal cavity which can develop and cause death within hours. The G-tube was found in Allen's abdominal cavity, and the cavity was filled with all of the formula and water that he had been given in the 12 hours before death.

### Department of Public Health

The DPH conducted an investigation. It issued a Class AA citation to the facility for "failure to identify care needs based on continuing assessment." Class AA citations are the most severe. They are issued when a regulatory violation causes the death of a patient in a care facility. (Health & Saf. Code, § 1424, subd. (c).) In January of 2005, the DPH referred a patient abuse complaint to the Department of Justice (DOJ).

### Department of Justice Investigation

The DOJ conducted an investigation. It reviewed records and interviewed Medlin, Carper, Lozano, Allen's physician, the gastroenterologist and the paramedics.[5]

A nurse evaluator for the DOJ reached the conclusion that Monterroso "violated the practice of vocational nursing" in California by failing to follow the physician's orders or facility procedures for G-tube replacement. The tube replacement procedures required her to "obtain/verify the physician order," to "aspirate for stomach contents to check patency" once the tube was in place and to "document procedure results; resident's tolerance; and any other pertinent information . . . ."

### Preliminary Hearing

Monterroso and Medlin were charged with dependent abuse and neglect and were held to answer after a preliminary hearing. At the preliminary

---

[5] Monterroso had moved to Las Vegas. The DOJ scheduled an interview with her in her home in July 2005, but she canceled the interview and did not return subsequent calls. She had moved out of her Las Vegas home suddenly on June 30, 2005. Monterroso was arrested later that month.

hearing, the prosecution's medical expert, Loren Lipson, M.D., testified that Allen's death was caused because Monterroso used the wrong sized G-tube, among other things. Dr. Lipson was under the mistaken impression that Allen had had a size 14 feeding tube until June 2.

Dr. Lipson also testified that Monterroso should have checked the physician's orders, should have called the physician to tell him that she was replacing the tube, should not have relied on auscultation to check placement and should not have interpreted the lack of gastric contents as meaning that Allen's stomach was empty. He testified that Monterroso should not have given fluid without checking or repositioning the tube after the patient became sweaty and distressed at 4:00 a.m.

According to Dr. Lipson, G-tube tracts can close up or become misaligned when the tube comes out, especially if the tube has been in place a short time. Allen's tube had been replaced six days earlier and Monterroso did not know how long the tube had been out that night.[6] Under these circumstances, she should have sent the patient to the emergency room so that a gastroenterologist could replace the tube.

Dr. Lipson testified that Medlin, as director of nursing, was responsible for ensuring nurse training in feeding tube placement, and there was no evidence that they had been trained in the recent past. He testified based on medical records that Allen was exhibiting signs and symptoms of infection between 7:00 a.m. and 3:30 p.m. consistent with inflammation of the peritoneal area. He testified that by noon Medlin was aware that Allen had severe problems and a fever with clear lungs, and that Medlin should have sent Allen to the hospital immediately.

### Trial

The cases against Monterroso and Medlin were consolidated for trial. Dr. Lipson testified that both Medlin and Monterroso recklessly caused Allen's death. On cross-examination Lipson was confronted with records from Allen's initial treatment that showed Allen had always had a size 20 G-tube. Dr. Lipson said this information did not change his opinions.

---

[6] A week before Allen's death, his father noticed a dark coffeelike substance coming up from Allen's G-tube. Allen's father alerted Allen's treating physician. On May 28, 2004, gastroenterologist Ahmed Rashed, M.D., performed an esophagogastroduodenoscopy and found that the feeding tube had become displaced. The tube had lodged in the opening of the small intestine (the duodenal bulb) where it was causing irritation. Dr. Rashed returned the tube to the correct position in the stomach. The G-tube was then used to feed Allen without incident until June 2.

Dr. Lipson testified that whenever a G-tube is pulled out the physician should be notified right away because it may have caused tearing or damage. If there is any question, the patient should be transferred to the emergency room where placement can be checked by X-ray. He testified that it is reckless not to aspirate gastric contents to ensure tube placement. If gastric fluids cannot be aspirated, the tube may be in the abdominal cavity instead of the stomach. He said that there is always some mucus or digestive fluid in the stomach. Lipson testified that auscultation does not verify proper placement because a whooshing sound can be heard in the abdominal area whether the tube is in the stomach or any other cavity. He also said that it is important to be consistent with tube size because a change can cause the path to the stomach to dislodge or open.

Dr. Lipson testified that Medlin was reckless because he did not immediately transfer Allen to a hospital when he showed signs of distress, fever and dropping oxygen saturation. He testified that signs of peritonitis include sweating, grimacing or groaning, rapid breathing and a drop in blood pressure and that peritonitis is very painful.

At the close of the prosecution's evidence respondents moved for dismissal pursuant to section 1118.1 on the ground that the prosecution's expert had been completely discredited. The trial court denied the motion, stating that it would defer to the jury on the question of credibility.

A nursing consultant and a physician testified on behalf of respondents that their care was not reckless and fell within the standard of care. The nurse testified that gastric contents should be aspirated, but it is not unusual to get no gastric contents. The physician (who had never placed a tube) testified that absence of gastric contents can mean it is time to feed the patient. They both testified that Allen's appearance and behavior were not unusual for Allen, based on nursing notes. Both testified that Medlin did not do anything wrong by waiting to call an ambulance. The jury acquitted respondents of all charges.

*Motions for Determination of Factual Innocence*

Both defendants moved for determinations of factual innocence. (§ 851.8, subd. (e).) In opposition, the prosecution submitted the investigation records of the DPH and the DOJ.

The court granted the motions. The court first stated that its tentative decision was to deny the motions because, "While I think they are factually innocent, I can't find that there was no probable cause or just cause to initiate the prosecution based on the information [the prosecution] had at that time . . . ." After hearing argument, the court granted the motions because "evidence did come before the People that indicated that their total theory was wrong," and it did "still feel that the defendants are factually innocent." When asked to identify the evidence to which the court referred, the court said, "the fact that there was a 20-gauge . . . needle [*sic*] in place from the beginning, [is] one thing. And I don't think that the failure to call a doctor, while it was a violation of an order, I don't think it had anything to do with gross negligence or criminal negligence."

## DISCUSSION

An order granting a petition for factual innocence is appealable by the prosecution. (§ 851.8, subd. (p)(1); *People v. Adair* (2003) 29 Cal.4th 895, 909 [129 Cal.Rptr.2d 799, 62 P.3d 45] (*Adair*).) We apply an independent standard of review and consider the record de novo to decide whether reasonable cause exists to believe that the person arrested committed the crime charged. "[A]lthough the appellate court should defer to the trial court's factual findings to the extent they are supported by substantial evidence, it must independently examine the record to determine whether the defendant has established 'that no reasonable cause exists to believe' he or she committed the offense charged. (§ 851.8, subd. (b).)" (*Adair*, at p. 897.) This stringent standard of review is necessitated by a legislative "intent to limit substantially the scope of relief under section 851.8." (*Id.* at p. 905.)

"[A]cquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." (*United States v. One Assortment of 89 Firearms* (1984) 465 U.S. 354, 361 [79 L.Ed.2d 361, 104 S.Ct. 1099].) A finding of factual innocence "shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made." (§ 851.8, subd. (b).) "[T]he record must exonerate, not merely raise a substantial question as to guilt." (*Adair, supra*, 29 Cal.4th at p. 909.)

In considering the petition, the court applies an objective standard. (*Adair, supra*, 29 Cal.4th at p. 905.) The hearing is not limited to the evidence presented at trial. (*Id.* at pp. 903–904.) The court may consider any evidence relied upon to arrest and charge, including "declarations, affidavits, police

reports, or any other evidence submitted by the parties which is material, relevant and reliable." (§ 851.8, subd. (b).) Even suppressed evidence is considered. (*Adair*, at p. 905, fn. 3.) The court may consider facts disclosed after arrest. (*Id.* at p. 905, fn. 4.)

■ A person petitioning for a finding of factual innocence has the initial burden to demonstrate the absence of reasonable cause. To meet this burden, the petitioner must show more than a viable defense to the crime. He or she must establish " 'that there was no reasonable cause to arrest him in the first place.' " (*Adair, supra*, 29 Cal.4th at p. 905, quoting *People v. Matthews* (1992) 7 Cal.App.4th 1052, 1056 [9 Cal.Rptr.2d 348].) If this burden is met, the burden shifts to the prosecution to demonstrate the existence of reasonable cause. (§ 851.8, subd. (b).)

We give no deference to the trial court's subjective determination that "I do still feel that and find that the defendants are factually innocent," because "[a] trial court's finding of factual innocence based solely on its own interpretation of the evidence does not sustain the defendant's burden any more than a failure of the prosecution to convict." (*Adair, supra*, 29 Cal.4th at p. 905.) The terms of the statute do "not accommodate any exercise of discretion to which the appellate court should defer." (*Id.* at p. 908.)

■ Violation of section 368, subdivision (b)(1) requires proof of willful conduct that caused a dependent adult to suffer under circumstances likely to produce great bodily harm or death.[7] Respondents concede that Allen was a dependent adult in respondents' care and that he died as a result of feedings being introduced directly into his abdominal cavity.

There is legal cause to believe that respondents willfully caused Allen to suffer. The statute does not require specific intent to injure but does require criminal negligence. (§ 7; *People v. Superior Court (Holvey)* (1988) 205 Cal.App.3d 51, 60 [252 Cal.Rptr. 335], disapproved on other grounds in *People v. Heitzman, supra*, 9 Cal.4th at p. 209, fn. 17.)

---

[7] Monterroso was charged with willfully placing Allen in a situation where his person or health was endangered under circumstances likely to produce great bodily harm or death. (§ 368, subd. (b)(1).) Medlin was charged with willfully causing or permitting Allen to suffer unjustifiable pain or suffering under circumstances or conditions likely to produce great bodily harm or death and having a legal duty to supervise and control persons who caused or inflicted unjustifiable pain or mental suffering on Allen, and failing to supervise or control that conduct. (§ 368, subd. (b)(1); *People v. Heitzman* (1994) 9 Cal.4th 189, 212 [37 Cal.Rptr.2d 236, 886 P.2d 1229].)

Criminal negligence requires a gross violation of an existing duty of care. (*People v. Manis* (1992) 10 Cal.App.4th 110, 114 [12 Cal.Rptr.2d 619, 12 Cal.Rptr. 619], disapproved on other grounds in *People v. Heitzman, supra,* 9 Cal.4th at p. 209, fn. 17.) There must be proof of "aggravated, culpable, gross, or reckless conduct, which is such a departure from the conduct of an ordinarily prudent person under the same circumstances as to demonstrate an indifference to consequences or a disregard of human life." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1439 [35 Cal.Rptr.2d 155].) The question is "whether a reasonable person in the defendant's position would have appreciated the risk his or her conduct posed to human life." (*People v. Lara* (1996) 44 Cal.App.4th 102, 108 [51 Cal.Rptr.2d 402].) The defendant's subjective awareness is irrelevant. (*Ibid.*)

There are no reported decisions describing criminally negligent medical procedures that violated section 368. Criminal convictions for violation of section 368 most commonly involve nonprofessional caregivers neglecting or abusing family members. (*People v. Heitzman, supra,* 9 Cal.4th 189; *People v. Matye* (2008) 158 Cal.App.4th 921 [70 Cal.Rptr.3d 342] [adult son beat disabled mother]; *People v. McKelvey* (1991) 230 Cal.App.3d 399 [281 Cal.Rptr. 359] [adult son left mother malnourished, lying in excrement with insects crawling on her].)

Health care professionals, however, have been prosecuted under section 368. In *People v. Superior Court (Holvey), supra,* 205 Cal.App.3d 51, the court considered a constitutional challenge to section 368 after two doctors and a nurse were held to answer on charges arising from the death of their elderly patient. That case had not yet gone to trial and the factual basis for the charges is not described in the opinion. (*People v. Superior Court (Holvey),* at p. 55, fn. 3.) In the wrongful death case *Guardian North Bay, Inc. v. Superior Court* (2001) 94 Cal.App.4th 963 [114 Cal.Rptr.2d 748], the defendant health care facility had previously pled no contest to six felony counts of violating section 368 in connection with the death of three elderly patients. The plaintiffs alleged that patients were denied adequate nutrition and hydration, developed bedsores and infections after lying in their own feces and urine, experienced severe pain which was not managed, that one patient was left partially nude, and that one patient's blood infection was not diagnosed or prevented.

In this case, respondents contend that they are factually innocent of criminal neglect because the entire prosecution was based on the mistaken belief that Monterroso replaced a size 14 G-tube with a size 20 G-tube, contrary to the physician's standing order. This is an oversimplification.

The expert's mistake about tube size substantially undermined his credibility, but it did not negate all legal cause to suspect criminal negligence. Evidence available to the prosecution showed that Monterroso replaced a G-tube without consulting a physician. Although there was a recent history of tube dislocation, it may have been forcibly removed and she did not know how long the tube had been out. There was evidence that Monterroso did not use graduated markings on the tube provided by the manufacturer to ensure proper placement, and that she failed to recognize that the tube was improperly placed when she was unable to aspirate gastric fluids. There was evidence that she proceeded to feed Allen at 6:00 a.m. without checking with anyone, although she had already medicated Allen for distress that she attributed to the tube change. Evidence was presented that a nurse trained in G-tube replacement would appreciate the risks of misplacing a tube and the need to ensure its placement by aspirating gastric fluids. This evidence gave reasonable cause to believe that Monterroso was criminally negligent.

Medlin contends that he is factually innocence because he had no notice of Allen's change in condition until 1:45 p.m., and that he had every reason to believe Allen suffered only from a cold. Carper testified that she called Medlin to check on Allen about 11:00 a.m., because he was sweating. By this time he had a fever and two nursing assistants had been unable to hear his blood pressure. There was evidence that Medlin failed to respond to obvious signs of patient distress: Allen's fever and dropping oxygen saturation. He attributed these signs to a cold notwithstanding the fact that Allen's lungs were clear, he had no mucus, and his feeding tube had recently been replaced. There was evidence that Medlin did not call for transport to the emergency room until an hour after Allen's physician told him to and that when the facility did call the ambulance, Allen was already dead. There was also evidence that Medlin had not ensured Monterroso was properly trained in G-tube placement, that he was responsible for doing so and that the risks of improper placement are well known by nurses. These facts provided reasonable cause to believe Medlin was criminally negligent.

■ The acquittals notwithstanding, after independent review of all of the evidence available to the prosecution we cannot conclude that " 'no objective factors justified official action . . . .' " (*Adair, supra,* 29 Cal.4th at p. 909, quoting *People v. Scott M.* (1985) 167 Cal.App.3d 688, 700 [213 Cal.Rptr. 456].)

## DISPOSITION

The order under review is reversed and vacated.

Gilbert, P. J., and Perren, J., concurred.