Filed 4/15/21 P. v. Boothe CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D077180 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN403958 ) |
| NATHANIEL L. BOOTHE, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Harry M. Elias, Judge. Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Nathaniel L. Boothe appeals from the trial court's denial of his petition for a judicial finding of factual innocence (Pen. Code,[1] § 851.8), following his acquittal on charges of assault with a deadly weapon (§ 245, subd. (a)(1)) and making a criminal threat (§ 422). Because we conclude from our independent review of the record that Boothe has failed to sustain his burden of establishing factual innocence, we affirm the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I.

### *The Evidence*

On October 1, 2019, the San Diego County District Attorney filed an information charging Boothe with assault with a deadly weapon (§ 245, subd. (a)(1)) and making a criminal threat (§ 422). The information also alleged Boothe personally used a deadly or dangerous weapon in the commission of the criminal threat. (§ 12022, subd. (b)(1).) After a two-day trial, the jury acquitted Boothe on both counts.

Gerardo G. (Gerardo[3]) was the victim and only witness of Boothe's alleged crimes. On August 18, 2019, the day of the alleged crimes, Gerardo called 911 and gave a statement to a sheriff's deputy. He testified at the preliminary hearing on October 1, 2019 and at trial on December 2, 2019.

---

[1] Unspecified statutory references are to the Penal Code.

[2] We directed the clerk of the superior court to transmit to this court the exhibits admitted during the preliminary hearing and trial. After being advised that the clerk of the superior court had returned the exhibits to the parties upon conclusion of the trial, we directed the parties to transmit the exhibits to this court. We have reviewed these exhibits, including the electronic files of the surveillance video, in deciding this appeal.

[3] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the victim by his first name and last initial only.

Each time he recounted the events, however, he was inconsistent in relating certain details.

A.     *Gerardo's Trial Testimony—Direct Examination*

At approximately 4:45 p.m. on August 18, 2019, Gerardo, who has difficulty walking and cannot use his right arm because he suffered a stroke, was at the Vista Transit Center. While waiting to catch a bus to go home, Gerardo tried to buy a soda, but the soda machine was out. Gerardo then entered a public restroom at the Vista Transit Center. The restroom had two side-by-side urinals and Boothe was inside the restroom using the left-hand urinal. When Gerardo entered, Boothe "stood between both the urinals not allowing [him] to use the bathroom." Gerardo said nothing and "waited patiently until [Boothe] was done."

After Boothe finished at the urinal, Boothe walked toward Gerardo and, using his right shoulder, pushed Gerardo while saying "very aggressively," " 'Get out of my way, you fucking beaner.' " Gerardo responded, " 'What's your problem?' " Boothe got "very aggressive" and said, " 'I'm going to kill you, you fucking beaner.' " Boothe pulled out a pair of scissors from his "backpack" and "went to try to stab" Gerardo in an "uppercut" motion. Holding the scissors with his fingers wrapped around the plastic handle, Boothe thrusted the closed metal blades once toward Gerardo in an uppercut motion from four or five feet away. In the restroom, Boothe thrusted the scissors once and threatened to kill Gerardo so many times that Gerardo "lost count." Gerardo got "[v]ery scared" and left the restroom without using the urinal.

When Gerardo exited the restroom, he saw Boothe behind him. Gerardo stood on the sidewalk outside the restroom and Boothe stood

3

underneath the pillar frame near the restroom entrance.[4]  There, Gerardo told Boothe he "was going to call the cops on him" while Boothe, using profanity and "very racial terms," continued "threatening" Gerardo that he was going "to kill [him]."  Gerardo believes Boothe had the scissors in his pocket at this time.  Gerardo was "[v]ery scared because [he] can't defend [himself] properly because of [his] stroke."  The exchange lasted approximately three to four minutes and Gerardo had considered videotaping Boothe "using all the racial words he was using."

Gerardo walked away from Boothe and stood near "a small standing billboard" that was 17 to 20 feet away from the restroom.  Boothe stayed where he was "for a little bit" and then walked toward Gerardo and followed him to the area of the billboard.  There, Boothe "pulled out the scissors again and swung them from the side of his body twice at [Gerardo]," who was about three or four feet away, with the metal blades pointed at Gerardo.  As he swung the scissors at Gerardo, Boothe said, " 'I'm going to kill you, you fucking beaner.' "  Gerardo was "very scared" and found Boothe's statements to be "very threatening."

B.    *911 Call*

Gerardo called 911 and reported "[t]hat there was a man trying to stab [him]."  Gerardo provided the emergency dispatcher with a description and location of Boothe.  Because the dispatcher instructed him to maintain visual contact with Boothe, Gerardo followed Boothe, who went behind the Vista Transit Center building to the platform and tracks for the Sprinter rail train.

---

4    The public restrooms are housed in the ticket building.  The exterior wall of the ticket building had an opening framed by two pillars that led into a small alcove.  The doors to the public restrooms for men and women are inside and on opposite ends of the alcove, with the door to the men's restroom located on the south end.

There, Boothe walked past Gerardo, who was still on the phone with the 911 dispatcher, and told Gerardo, " 'They're never going to find the weapon because I just hid it.' "

After Gerardo described his 911 call, the prosecutor played an audio recording of the 911 call for the jury. In the recording, Gerardo told the emergency dispatcher: "There's a guy yelling a bunch of, uh, racist, uh, comments and he's spitting on people. And pulling out, uh, some scissors" and "saying that he's gonna kill everyone cause they're Mexican." The dispatcher asked Gerardo, "He has some scissors that he's threatening people with?" Gerardo responded, "Yeah, he is." Gerardo told the dispatcher: "I was gonna grab, uh, the bus to Escondido. He started yelling bunch of racist stuff. I walked by him and he pulled out some scissors and started spitting on me." Gerardo said he was not injured but scared. The dispatcher then asked Gerardo if "[h]e was . . . spitting at Hispanics and everybody?" and Gerardo said, "Yeah." The dispatcher asked whether the scissors were big, ten-inch, paper-cutting scissors, and Gerardo agreed they were. Gerardo told the dispatcher that "[h]e's walking right by me right now" and "saying that you guys can't find the scissors," that he's " 'hid the scissors' or something. He said he hid the scissors." Before the call ended, Gerardo told the dispatcher that "there's allota people . . . that are scared of this guy right here."

After the recording was played for the jury, Gerardo explained that "[i]t felt like [Boothe] was spitting at [him], but it could have been him just speaking" when Boothe was calling Gerardo a "fucking beaner." When the prosecutor asked about his statement to the emergency dispatcher that Boothe was spitting on other people, Gerardo replied, "The people -- no. The people that were just walking by, I guess." Finally, Gerardo explained he

could be heard on the 911 call, in Spanish, telling "people that were walking to be careful with this man because he had the scissors."[5]

C.    *Gerardo's Statement to Deputy Thompson*

Deputies from the San Diego County Sheriff's Department, including Deputy Robert Thompson, responded to the Vista Transit Center upon receiving a radio call of a "man with a weapon." When Deputy Thompson arrived, other deputies had already detained Boothe and a pair of scissors, approximately nine inches long with a blue and grey handle, had been recovered from Boothe's bag.

Deputy Thompson interviewed Gerardo at the scene shortly after he arrived. Deputy Thompson recorded the following statement from Gerardo in his arrest report:[6]

> "[Gerardo] said he thought Boothe was high or on 'something.' He stated that Boothe was walking into the restroom and started saying racial slurs like 'Beaner" towards [Gerardo]. [Gerardo] said that he told Boothe he needed to calm down when Boothe yelled 'Go back to Mexico you stupid beaner' and 'I'm going to kill you.' [Gerardo] said that he exited the restroom and Boothe was still yelling racial slurs. Once outside of the restroom, [Gerardo] said that Boothe had a pair of large scissors in his hand. [Gerardo] described the scissors as silver in color, approximately 10 inches long with a colored handle. [Gerardo] said that Boothe began to walk towards him with scissors at his side with the

---

[5]    In a portion of the 911 recording, which was not transcribed, Gerardo is speaking in Spanish.

[6]    Pursuant to section 851.8, subdivision (b), which permits the court to consider police reports in determining factual innocence, Boothe attached a copy of Deputy Thompson's arrest report to the points and authorities filed in support of his petition. Although the report was not admitted at trial, we restate Gerardo's statement to Deputy Thompson in its entirety since Gerardo was cross-examined on its contents and we have considered the statement in deciding this appeal.

6

point towards him. He said that Boothe thrusted the scissors towards him at least two to three times. [Gerardo] said that was when he called 911. [Gerardo] stated Boothe walked towards the train tracks and stated that he 'Hid the scissors' and that 'We'd never be able to find them.' [Gerardo] stated he desires prosecution and stated he would be willing to testify in court. [Gerardo] declined any medical treatment. [Gerardo] stated that there were other witnesses, but that they had all left on the passing trains."

At trial, Deputy Thompson testified that when he interviewed Gerardo, Gerardo appeared "a little shaken up" like "[s]omebody had just been through something that would cause fear." After taking his statement, Deputy Thompson showed Gerardo the scissors recovered from Boothe's bag and Gerardo identified them as the scissors Boothe used to assault him.

On cross examination, Deputy Thompson confirmed that Gerardo told him there was only a "verbal altercation" inside the restroom. He never told Deputy Thompson there was any physical contact inside the restroom. Instead, he said the scissors were not produced by Boothe until both men were outside the restroom, and that Boothe took two to three "swings of the scissors" at him outside the restroom. Gerardo never told Deputy Thompson that Boothe spit on him, threatened other people with the scissors, or claimed to have a gun. Deputy Thompson testified Gerardo told him the scissors handle was "yellowish," although he had written in his report that Gerardo described it as a "colored handle."

D. *Gerardo's Testimony at the Preliminary Hearing*

At the preliminary hearing on October 1, 2019, Gerardo testified to the following account of the incident:

While he was at the Vista Transit Center waiting for his bus, Gerardo tried getting a soda but the soda "machine didn't work." He went to the public restroom where he encountered Boothe inside "urinating" at one of the

7

two urinals.  Boothe "blocked [Gerardo] off so that [he] couldn't urinate" by standing in between both urinals.  Gerardo "just waited there patiently [and] didn't talk to him."  When Boothe finished, he walked towards Gerardo and "push[ed] [him] with his shoulders" and called Gerardo "an F'ing beaner."  Boothe told Gerardo, " 'Get the F out of my way you F'ing beaner.' "  Gerardo asked Boothe, " 'What's your problem?' "  In a "very aggressive[ ]" tone, Boothe responded, " 'I'm going to kill you.' "  At that time, Boothe grabbed a pair of scissors out of his "backpack."  With the metal blades pointed at Gerardo, Boothe swung the scissors once at Gerardo "trying to stab" him.  Boothe told Gerardo, " 'I'm going to kill you' " as he swung the scissors at him in an "uppercut motion."  Boothe threatened to kill him multiples times and Gerardo "lost count."

Gerardo was afraid and left the restroom first.  Boothe followed behind him and, standing outside the restroom door near "the pillars," Boothe continued to tell Gerardo that "he's going to kill [him] you F'ing beaner."  As the two men stood there outside the restroom door, Boothe told Gerardo "he had a gun and that he was going to kill" Gerardo.  Gerardo walked away.  Gerardo considered recording Boothe "when he [came] at [him] with the scissors again."  Boothe swung the scissors at Gerardo twice, with the metal blades pointed at Gerardo, while telling him, " 'I'm going to kill you, you F'ing beaner.' "

Boothe kept the scissors "on his side" when he pulled them out inside the restroom and kept the scissors in his hands during the "entire argument" between the two men inside the restroom.  Gerardo estimated he was about four feet from Boothe when he swung the scissors at him inside the restroom, and about two to three feet away when Boothe swung the scissors at him outside the restroom.  Gerardo said the scissors "were pretty big" and "[t]hey

had some handles that were a bright color," although he couldn't remember "if it's green or red." From a photograph, Gerardo identified the pair of scissors recovered from Boothe's bag as the pair Boothe used to assault him.

E. *The Surveillance Videos*

At trial, the prosecution showed the jury video footage captured by surveillance cameras installed at the Vista Transit Center. The footage was time-stamped in 24-hour time format (e.g., 16:00 rather than 4:00 p.m.) and begins at 16:34 on August 18, 2019. Still photographs depicting the orientation of the Vista Transit Center, the ticket building with the public restrooms, and the transit station platform were also shown to the jury.

The Vista Transit Center is located at 101 Olive Avenue, a street that runs north and south. The public restrooms are located inside the ticket building, which is on the east side of Olive Avenue. North of the ticket building, on the same side of the street, is the location where buses load and unload passengers. The transit station platform and Sprinter railway tracks are north of the ticket building, between Olive Avenue and North Santa Fe Avenue to the east.

One of the surveillance cameras, identified as "Bus PTZ 1," was installed on the exterior wall of the ticket building. The exterior wall of the ticket building had an opening framed by two pillars that led into a small alcove. The doors to the public restrooms for men and women are inside and on opposite ends of the alcove, with the door to the men's restroom located on the south end. The camera was mounted just outside and above the alcove to the restrooms, on the corner underneath the eave of the roof. The camera was positioned almost parallel to the building's exterior wall, but angled slightly outward and downward, so that it showed only the area of the bus loading zone on Olive Avenue and the sidewalk immediately outside and in

9

front of the pillar-framed alcove. Because of the camera's position and angle, the inside of the alcove itself and the men's restroom door were out of view.

A second surveillance camera, identified as "Bus PTZ 2," was mounted on the northwest corner of the ticket building, closer to the bus loading zone on Olive Avenue. This camera showed the bus stops and the sidewalk adjacent to the bus stops, as well as part of a soda machine near the ticket building. A third surveillance camera, identified as "SPlatform PTZ W," was pointed at one of the transit station platforms near the Sprinter railway tracks. We summarize the events seen on the footage from cameras "Bus PTZ 1," "Bus PTZ 2," and "SPlatform PTZ W" sequentially by time stamp:

(1) At 16:36:18, Boothe, who is carrying a duffle bag, gets off a bus at the bus loading zone. After a moment, he walks north on Olive Avenue and turns east onto a walkway in the direction of the transit station platform.

(2) At 16:40:06, Gerardo is seen walking south on the sidewalk from the bus loading zone. He stops and tries to buy a soda from the machine but comes up empty-handed. At 16:41:57, Boothe comes back onto the sidewalk, with the duffle bag over his shoulder, and walks past Gerardo, who is still at the soda machine, and continues south. A minute later, Gerardo leaves the soda machine, without a soda, and walks south in the same direction as Boothe.

(3) At 16:42:28, Boothe, with the duffle bag over his shoulder, continues south on Olive Avenue with Gerardo several paces behind him. Both men continue walking south until they reach the public restrooms. At 16:42:51, Boothe enters the alcove, towards the men's restroom, and Gerardo follows him ten seconds later at 16:43:02. Both men are out of view when they enter the alcove.

10

(4)     At 16:44:20, Boothe emerges from the alcove, steps onto the sidewalk, removes the duffle bag from his shoulder, and drops it on the sidewalk. He reenters the alcove out of view at 16:44:34, leaving the duffle bag on the sidewalk.

(5)     At 16:44:58, Gerardo emerges from the alcove and as he does, he looks back in the direction of the restroom and appears to be talking. He steps onto the sidewalk and continues to talk and gesticulate while facing the restroom area. At 16:45:53, he turns and walks south on the sidewalk and out of view.

(6)     At 16:45:54, Boothe emerges from the alcove. Nothing is visible in his hands. He steps onto the sidewalk, leans against a pillar next to his duffle bag, and, while facing the direction in which Gerardo just left, Boothe is talking and appears to manipulate the area of his right front pants pocket. He briefly walks back into the alcove, mostly out of view, and comes out of the alcove a few seconds later and leans back against the same pillar. He continues talking and gesticulating, while appearing to manipulate or adjust the area of his right front pants pocket and zipper. He picks up his bag and touches the contents of the bag's open pocket. At 16:47:19, Boothe leaves the restroom area and walks in the same direction as Gerardo and out of view.

(7)     At 16:49:00, Boothe walks back up the sidewalk, carrying the duffle bag with his right hand, north towards the ticket building. When he reaches the area of the ticket building office, he stops, turns around and looks back in the direction from where he just came. He goes behind the ticket building and out of view. He is later at the soda machine and remains there a few seconds before walking north toward the direction of the transit station platform. At 16:50:32, Boothe appears at the platform near the railway tracks and walks west across the railway tracks and out of view.

11

(8)     At 16:51:36, Gerardo is walking back up the sidewalk toward the ticket building and appears to be using a cell phone.  He walks behind the ticket building and out of view.  At 16:52:32, Gerardo appears at the transit station platform near the railways, in the same area as Boothe had appeared only a few minutes earlier.  At 16:53:02, Boothe walks east across the railway tracks back to the platform and towards Gerardo, who is still using his cell phone.  Boothe walks up to Gerardo, passes him, and disappears out of view at 16:53:22; he is not seen again on this platform.  Gerardo continues using his cell phone until 16:55:27 and disappears out of view.

(9)     At 16:53:50, Boothe returns to the bus loading zone and stops at a bench.  A minute later, Boothe stands up and places his right hand to his right ear, gesturing as if he is trying to hear someone.  He then spreads out his arms and begins to get down on his knees onto the sidewalk.  At 16:55:20, four sheriff deputies emerge from southbound Olive Avenue and approach Boothe, who has assumed a prone position on the sidewalk.  Boothe is detained as more deputies arrive; one deputy is seen searching Boothe's duffle bag, and while the items can be seen being removed from the duffle bag, they are not identifiable from the video.  At 17:05:16, deputies place a handcuffed Boothe into a patrol vehicle.

At various times, there are other people at the bus loading zone, the ticket building, and on the transit station platform, but they do not appear to react to Boothe, and Boothe is not seen to spit on or engage with them.

F.     *Defense Counsel Highlights the Inconsistencies*

On cross examination at trial, defense counsel confronted Gerardo with the inconsistencies in his various accounts from the 911 call, his statement to Deputy Thompson, his preliminary hearing testimony, and his direct

12

testimony at trial.[7]  Confronted with his inconsistencies, Gerardo claimed not to recall the earlier statements or blamed the inaccuracy on "adrenaline."  In closing arguments, defense counsel sought to highlight, and the prosecution sought to minimize, the inconsistencies in Gerardo's descriptions of the incident.  Defense counsel also identified ways in which Gerardo's testimony and the surveillance video footage appeared to conflict.

The jury acquitted Boothe on the charges of assault with a deadly weapon and making a criminal threat.

## II.

### *The Petition and Hearing on Factual Innocence*

Following his acquittal, Boothe filed a petition for a finding of factual innocence under section 851.8, subdivision (e), before the same judge who presided over the trial.  In support of his petition, Boothe relied on the preliminary hearing transcript, the trial transcript, evidence admitted at trial, and Deputy Thompson's arrest report.

Boothe argued that Gerardo, the only witness to the charged crimes, was shown to be "completely and unequivocally not credible" given the inconsistencies in his various statements.  He also argued the surveillance video revealed Gerardo's "testimony was grossly inaccurate, if not an outright lie."  According to Boothe, the surveillance video "proved [Gerardo] was not telling the truth" because "[e]verything that [Gerardo] claimed occurred that should have been caught on video surveillance was not."  Boothe claimed that if Deputy Thompson had the benefit of Gerardo's 911 call, the surveillance video, and Gerardo's preliminary hearing testimony, Deputy Thompson

---

[7]    Because we discuss the specific inconsistencies identified by Boothe in our de novo review of his petition, *post*, we do not repeat them here.

13

"would have clearly seen the inaccuracies in [Gerardo's] claims" and it was "doubtful he would have arrested Mr. Boothe." From this, Boothe concluded "there can be no reasonable cause" to believe that he committed the offenses for which the arrest was made.

In its written opposition, the prosecution—while correctly noting that the trial court is not limited to the evidence presented at trial and may consider facts disclosed after arrest—focused only on the facts set forth in Deputy Thompson's arrest report and argued those facts provided Deputy Thompson with "probable cause to arrest [Boothe] for the underlying crime." The prosecution did not address Boothe's contentions regarding the surveillance video or the 911 call; rather, it argued the jury's acquittal established only that the prosecution failed to meet its burden of proof at trial and not Boothe's factual innocence.

The trial court held a hearing on Boothe's petition and began the hearing by stating, "I've read everything. I remember the trial, including the videos." Following the court's statement, defense counsel argued the inconsistencies in Gerardo's various statements proved Gerardo had "lied to law enforcement, he lied on the 911 phone call, he lied at the preliminary hearing, and he lied on this very stand . . . [at trial]." The prosecutor acknowledged the inconsistencies but maintained that "the motion before the Court is regarding whether or not the deputies had probable cause to arrest" Boothe. The prosecutor argued the evidence developed by the deputies before the arrest, including the deputies' observations, the victim's statement, and the recovery of the scissors in Boothe's duffle bag, was sufficient to meet this standard.

The court denied Boothe's petition and stated: "So based on a review of all of the evidence and recalling the trial, first, it's clear to the Court that

14

there was in fact probable cause for the deputies to follow through in terms of what they received and make the arrest, and that alone will be sufficient grounds to deny the 851.8. I've gone beyond that on occasions if I think someone is truly factually innocent. I don't believe that's the case here, so the 851.8 is denied."

## DISCUSSION

## I.

### *The Legal Standard for Determining Factual Innocence*

A defendant acquitted of criminal charges may petition the trial court for a finding of factual innocence and seek an order for the sealing and destruction of the arrest records of those charges. (§ 851.8, subds. (b) & (e).) However, an acquittal at trial does not compel the conclusion that the defendant is factually innocent; " 'it merely proves the existence of a reasonable doubt as to his guilt.' " (*People v. Medlin* (2009) 178 Cal.App.4th 1092, 1101; *People v. Bleich* (2009) 178 Cal.App.4th 292, 300.) " '[M]uch more than a failure of the prosecution to convict is required in order to justify [a finding of factual innocence and] the sealing and destruction of records under section 851.8.' " (*People v. Adair* (2003) 29 Cal.4th 895, 905 (*Adair*), quoting *People v. Scott M.* (1985) 167 Cal.App.3d 688, 700 (*Scott M.*), disapproved on other grounds in *Adair*, at pp. 907-908.)

Rather, " '[s]ection 851.8 is for the benefit of those defendants who have not committed a crime. It permits those petitioners who can show that the state should never have subjected them to the compulsion of the criminal law—because no objective factors justified official action—to purge the official records of any reference to such action.' " (*Adair*, *supra*, 29 Cal.4th at p. 905, quoting *Scott M.*, *supra*, 167 Cal.App.3d at pp. 699-700.) "A [defendant's] burden to establish factual innocence has been described as ' "incredibly

high" ' and as requiring ' "no doubt whatsoever." ' " (*People v. Mazumder* (2019) 34 Cal.App.5th 732, 738.)  "In sum, the record must exonerate, not merely raise a substantial question as to guilt." (*Adair*, *supra*, 29 Cal.4th at p. 909.)

Subdivision (b) of section 851.8 sets forth the procedure the trial court must follow when presented with a petition for a finding of factual innocence. The trial court holds a hearing, at which "the initial burden of proof shall rest with the [defendant] to show that *no reasonable cause exists* to believe that the [defendant] committed the offense for which the arrest was made." (§ 851.8, subd. (b), italics added; *Adair*, *supra*, 29 Cal.4th at pp. 902-903.)  "If the court finds that this showing of no reasonable cause has been made by the [defendant], then the burden of proof shall shift to the [prosecution] to show that a reasonable cause exists to believe that the [defendant] committed the offense for which the arrest was made." (§ 851.8, subd. (b); *Adair*, at p. 903.)

At the hearing, the court may consider any "declarations, affidavits, police reports, or any other evidence submitted by the parties which is material, relevant, and reliable." (§ 851.8, subd. (b); *Adair*, *supra*, 29 Cal.4th at pp. 903-904.)  Evidence that may support the existence of reasonable cause under section 851.8, subdivision (b), includes "the current evidence rather than simply the evidence that existed at the time that the arrest and prosecution occurred." (*People v. Laiwala* (2006) 143 Cal.App.4th 1065, 1068, fn. 3.)  This detail is not insignificant, because a defendant may claim he is factually innocent " 'notwithstanding probable cause to arrest,' " and in such a case, " 'facts subsequently disclosed may establish the defendant's innocence.' " (*Ibid.*, quoting *Adair*, at p. 905, fn. 4.)

Further still, section 851.8, subdivision (b), directs that "[a] finding of factual innocence and an order for the sealing and destruction of records . . . *shall not be made unless the court finds that no reasonable cause exists* to believe that the [defendant] committed the offense for which the arrest was made." (§ 851.8, subd. (b), italics added; *Adair, supra,* 29 Cal.4th at p. 905.) Section 851.8 imposes an objective legal standard on the court in determining whether the evidence establishes factual innocence. (*Adair,* at p. 905.) "In other words, the trial court cannot grant relief if *any* reasonable cause warrants" the belief that the defendant committed the offense for which the arrest was made. (*Id.* at p. 904.) " ' " 'Reasonable cause' " ' is a well-established legal standard, ' "defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." ' " (*Ibid.*)

Thus, Boothe must demonstrate there were no objective facts from which a person of ordinary care and prudence could entertain an honest and strong suspicion that he committed the crimes for which he was arrested, the absence of which compels the conclusion the system erred and he should never have been subjected to any arrest or the criminal justice process. (*Adair, supra,* 29 Cal.4th at pp. 904-905, 909.) He must demonstrate that "the record . . . exonerate[s him], not merely raise a substantial question as to [his] guilt." (*Id.* at p. 909.)

We review a trial court's denial of a petition for factual innocence under the de novo standard. (*Adair, supra,* 29 Cal.4th at pp. 897, 908.) Although we "defer to the trial court's factual findings to the extent they are supported by substantial evidence, [we] must independently examine the record to determine whether the defendant has established 'that no reasonable cause exists to believe' he . . . committed the offense charged." (*Id.* at p. 897.)

17

*Analysis*

Boothe contends the trial court erroneously denied his petition for factual innocence by "treating the validity of the initial arrest as dispositive" and as sufficient grounds to deny his petition. In doing so, Boothe argues the court "answered the wrong legal question" and failed to consider all the evidence, particularly the surveillance video and Gerardo's inconsistent accounts of the crimes, before denying his petition. The People respond that the court made clear it did take all the evidence into account in ruling on Boothe's motion, and that the court properly determined, based on the totality of the evidence, that Boothe was not factually innocent.

We are not persuaded that the trial court limited its inquiry only to the question of whether the arrest was valid, thereby failing to consider the current evidence rather than merely the evidence that existed at the time of arrest. The court began the hearing with a preamble to inform the parties it had "read everything" and "remember[ed] the trial, including the videos." And in denying Boothe's petition, the court stated its ruling was "based on a review of all of the evidence and recalling the trial." The court's statement that "it's clear to the Court that there was in fact probable cause for the deputies to follow through in terms of what they received and make the arrest, and that alone will be sufficient grounds to deny the 851.8" cannot be divorced from its preamble or the entirety of its ruling, which included a final statement by the court that it did not believe this was a case where it "think[s] someone is truly factually innocent."

However, to the extent there is any ambiguity as to whether the trial court answered the correct legal question, we conclude from our independent and careful review of the record that Boothe has failed to meet his burden of

18

establishing that "no reasonable cause exists" to believe he committed the offenses for which he was arrested. (§ 851.8, subd. (b); *Adair*, *supra*, 29 Cal.4th at p. 897.) In denying a section 851.8 petition, a court does not " ' "disagree" ' " with the jury's verdict; rather it " 'refines that verdict by distinguishing between those cases where acquittal is based upon actual innocence and those where acquittal is based upon the prosecution's failure of proof.' " (*Adair*, at p. 907, quoting *Scott M.*, *supra*, 167 Cal.App.3d at p. 699.) While the inconsistencies Boothe identifies in the 911 call, surveillance video, and testimonial evidence were sufficient to create reasonable doubt in the jury, they fail to exonerate him and establish his actual innocence. (*Adair*, at p. 909; see *Scott M.*, at p. 700 [" '[T]he requirement of proof beyond a reasonable doubt often results that defendants, who are not factually innocent, are acquitted.' "].)

Boothe faced charges of making a criminal threat (§ 422)[8] and assault with a deadly weapon (§ 245, subd. (a)(1)).[9] His assertion that he was

---

[8]    The elements of making a criminal threat are: (1) the defendant willfully threatened to unlawfully kill or cause great bodily injury to another person; (2) the threat was made orally, in writing, or by means of an electronic communication device; (3) the defendant specifically intended his statement to be understood as a threat; (4) the threat was so clear, immediate, unconditional, and specific that it communicated to the threatened person a serious intention and the immediate prospect the threat would be carried out; (5) the threat actually caused the threatened person to be in sustained fear for their own safety; and (6) the threatened person's fear was reasonable under the circumstances. (§ 422; 1 CALCRIM No. 1300 (Rev. Sept. 2020).)

factually innocent of these crimes relies on the contention that Gerardo's deficiencies as a witness and the surveillance video compel the conclusion that the whole account was fabricated. For several reasons, we disagree.

To begin with, although Gerardo was inconsistent in relating certain details of Boothe's offenses, he was consistent in his account of the material facts. When interviewed by Deputy Thompson, when testifying at the preliminary hearing, and when testifying at trial, Gerardo said that Boothe had threatened to kill him. He testified at the preliminary hearing and trial that the threats scared him, and he explained at trial he was scared because he could not properly defend himself because of his disability. These facts established the essential elements of making a criminal threat in violation of section 422. (See fn. 8, *ante*.)

Moreover, Gerardo's claim that he had been threatened was independently corroborated by Deputy Thompson, who described Gerardo at the scene as "a little shaken up" like "[s]omebody had just been through something that would cause fear." It was also corroborated by the surveillance video footage of the sidewalk outside the restroom entrance. The footage did not have an audio component, but it showed Boothe and Gerardo entering the restroom with no apparent prior interaction, and each emerging from the restroom while appearing to yell at each other. This supports

---

9      The elements of assault with a deadly weapon are: (1) the defendant committed an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person; (2) the defendant did that act willfully; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in the application of force to someone; (4) when the defendant acted, he had the present ability to apply force with a deadly weapon to a person; and (5) the defendant did not act in self-defense. (*People v. Golde* (2008) 163 Cal.App.4th 101, 121.)

Gerardo's account that an altercation had occurred inside the restroom. Independent corroboration of the victim's report of a crime reduces the likelihood of prevarication and is supportive of a finding of probable cause. (See *Illinois v. Gates* (1983) 462 U.S. 213, 244-245 (*Gates*) ["It is enough, for purposes of assessing probable cause, that '[corroboration] through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.' "].)

Gerardo was also consistent in relating the essential aspects of Boothe's assaults. He reported that Boothe had held a pair of scissors in his hand, had thrust the metal blade of the scissors at Gerardo from a short distance away, and had done this several times while saying, "I'm going to kill you, you fucking beaner." The nature of the weapon itself was not in question and was consistently reported by Gerardo, including during his call with the emergency dispatcher *before* the scissors were recovered from Boothe's bag, independently corroborating that Gerardo had seen Boothe brandishing them. (*Gates*, *supra*, 462 U.S. at p. 241.) These essential facts were sufficient to establish the elements of section 245, subdivision (a)(1), and to create an honest and strong suspicion Boothe had committed the offense of assault with a deadly weapon.

And while the defense meticulously itemized Gerardo's deficiencies as a narrator at trial, we disagree with the position that these shortcomings were so serious as to suggest, as Boothe does, that Gerardo was a "liar." "The fact that a witness has made inconsistent and exaggerated statements does not indicate an inability to perceive, recollect and communicate or to understand his duty to tell the truth." (*People v. Willard* (1983) 155 Cal.App.3d 237, 240 (*Willard*).) Gerardo's purported inconsistencies, upon examination, were either not inconsistencies at all, were understandable under the

21

circumstances, or were simply not significant enough to suggest Gerardo had fabricated the entire incident.

First, Gerardo's varying descriptions of the color of the scissors handle is not material; there was no dispute the scissors later recovered from Boothe's bag were identified by Gerardo as the weapon used to commit the assault. Gerardo's mistake about the color is also understandable when one considers that Boothe held the scissors with his fingers wrapped around the handle, which would have obscured the handle from view.

Gerardo's statements to the 911 dispatcher that Boothe had been threatening "others" apart from himself was an exaggeration; Gerardo later acknowledged he was the only person Boothe had threatened. Gerardo's claim that Boothe had been "spitting" was also hyperbolic; he explained at trial Boothe had spat on him while talking. He made these overblown statements in the heat of the moment, apparently before he and Boothe had completely disengaged. Gerardo's exaggerated claims to the dispatcher are understandable under the circumstances as the result of excited emotion and are not a persuasive indication he fabricated Boothe's crimes. That a victim "embellished" his testimony does not establish factual innocence. (*Scott M.*, *supra*, 167 Cal.App.3d at pp. 696-697 [affirming the trial court's denial of a section 851.8 petition where the trial court did not "consider (defendant) factually innocent because, in its judgment, the jury decided the case when it had been demonstrated that (a rape victim) 'embellished' her testimony."].)

And while Gerardo apparently told Deputy Thompson all three assaults had happened outside the restroom, whereas the first assault had actually happened inside the restroom, the location of the assault was not material to the commission of the offense. Gerardo explained at trial the mistake was the result of "adrenaline," which is a credible explanation. And while

22

Gerardo volunteered for the first time at the preliminary examination that Boothe had claimed to have a gun, he explained on cross examination at trial that he told "the police officer" about Boothe's claim of a gun. Gerardo's failure to recite the details of the incident identically each time he recounted them is not unusual in a witness and does not compel the conclusion he was untruthful. We simply disagree that the disparities indicated a complete lack of credibility. (*Willard*, *supra,* 155 Cal.App.3d at p. 240.)

Finally, we have reviewed the surveillance video in considering Boothe's claim that the video exonerates him because it does not show him holding scissors. The difficulty with Boothe's position is that the locations where Gerardo reported the assaults to have occurred were not captured by any surveillance camera. One, there was no surveillance of the interior of the restroom and thus, the video evidence could not and did not disprove that Boothe assaulted Gerardo there. Two, Boothe argues the surveillance video showed that his hands were empty when he emerged into view from the alcove, and that belies Gerardo's testimony that Boothe exited the restroom with the scissors in his hand. This argument, however, overlooks the fact that the alcove and restroom doorway themselves were not captured by the camera. The video does not prove or disprove whether Boothe had anything in his hand when he walked out through the restroom door. Lastly, Gerardo testified that Boothe swung at him twice more with the scissors outside the restroom near the billboard 17 to 20 feet south of the restroom on Olive Avenue. The photographs admitted at trial confirm that the billboard was some distance south of the restroom. Boothe does not indicate, nor does our own viewing of the video and photographic evidence reveal, that the location of the billboard was surveilled by any camera. Accordingly, we cannot agree

23

with Boothe that the surveillance video exonerated him of assaulting Gerardo with the scissors.

In sum, having considered the totality of the evidence, including the inconsistencies in Gerardo's testimony and the surveillance video, we cannot conclude there were facts "which would lead no person of ordinary care and prudence to believe or consciously entertain any honest and strong suspicion that [Boothe] is guilty of the crimes charged." (*Adair, supra*, 29 Cal.4th at pp. 904-905, 909.)  The record raises reasonable doubt as to his guilt, but it does not exonerate him.  (*Id.* at p. 909.)  Accordingly, we conclude Boothe has failed to meet his burden of establishing factual innocence under section 851.8 and affirm the trial court's order denying his petition.

DISPOSITION

The order denying Boothe's section 851.8 petition for a finding of factual innocence is affirmed.


DO, J.

WE CONCUR:


BENKE, Acting P. J.


GUERRERO, J.


24