[No. S098218. Jan. 30, 2003.]

THE PEOPLE, Plaintiff and Appellant, v.
JEANIE LOUISE ADAIR, Defendant and Respondent.

## COUNSEL

Gil Garcetti and Steve Cooley, District Attorneys, George M. Palmer, Head Deputy District Attorney, Fred Klink and Patrick D. Moran, Deputy District Attorneys, for Plaintiff and Appellant.

John Steinberg, under appointment by the Supreme Court, for Defendant and Respondent.

## OPINION

**BROWN, J.**—When a defendant is acquitted of criminal charges, Penal Code section 851.8, subdivision (e),[1] authorizes a petition to the trial court for a finding of factual innocence. (See § 851.8, subd. (b).) The question presented here is the appropriate standard of review on appeal from such a finding. (§ 851.8, subd. (p)(1).) From the statutory scheme, we conclude that although the appellate court should defer to the trial court's factual findings to the extent they are supported by substantial evidence, it must independently examine the record to determine whether the defendant has established "that no reasonable cause exists to believe" he or she committed the offense charged. (§ 851.8, subd. (b).) Applying that standard to the facts of this case, we find that defendant failed to carry her burden. Accordingly, we affirm the judgment of the Court of Appeal.

### PROCEDURAL AND FACTUAL BACKGROUND

Jeanie Louise Adair (defendant) was charged with the murder of her husband, Robert Adair. (§ 187, subd. (a).) The prosecution also alleged

---

[1]All statutory references are to the Penal Code.

special circumstances of murder carried out for financial gain (§ 190.2, subd. (a)(1)) and while lying in wait (*id.*, subd. (a)(15)) and use of a dangerous or deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)).

## Trial Proceedings

Defendant's trial lasted one month and included the testimony of more than 40 witnesses as well as more than 80 exhibits. The Court of Appeal opinion recounts the evidence in substantial detail; however, for present purposes an abbreviated rendition will suffice.

The murder occurred sometime during the early afternoon on November 5, 1996, in the condominium defendant and the victim shared with their children. Sometime between 1:00 and 2:00 p.m., a neighbor heard a banging at his gate and discovered defendant upset and asking for help. She said her husband was lying on the floor not breathing, but told the neighbor not to go inside the residence because "the person is still in there."

When rescue personnel arrived, they found Robert dead with blood around his head. An autopsy concluded Robert had died from multiple blunt force trauma to the head, consistent with blows from a baseball bat. Although the police found some evidence the residence had been ransacked, one detective testified the ransacking was not consistent with a burglary or home invasion robbery. In addition, valuables and cash in plain sight had not been taken.

Defendant gave several descriptions of what took place, some with marked discrepancies. In one version, she explained that about 10:00 a.m., a man posing as a gas company employee gained entry to her home, knocked her down, and kicked her in the face. He then took her upstairs where he bound her hands with electrical tape and gagged her. The intruder asked, "Where is your stuff, bitch? I want your stuff," and searched through drawers and closets for valuables. A noise sounded, which defendant assumed was Robert's arrival, and the intruder went downstairs. She did not hear any further sounds and after managing to free herself went downstairs to find Robert in a pool of blood.

In a different telling, defendant indicated the suspect had pulled a knife on her when entering the residence and told her, "If you scream, I'll kill you, bitch." After she was taken upstairs, tied up, beaten, and kicked, Robert came home and called out to her. At this point, the intruder went to another room, grabbed a baseball bat, warned defendant to keep quiet, and went downstairs; she then heard a "thump." She removed the tape used to bind her with a tool that tightened her knee brace and went downstairs. In some

versions, defendant was tied to a chair; in others, she was hog-tied, without a chair being involved. She described the intruder variously as White, Black, and Hispanic.

Prosecution witnesses testified that Robert received two telephone calls at work from defendant, at least one of which came when she claimed to be bound and gagged. Dr. Michael Shapiro, defendant's orthopedic surgeon with whom she was having an extramarital affair, also may have received a call from her at his office about the same time.

With respect to the severity of defendant's injuries, some police emergency and medical personnel thought they were inconsistent with her description of events and she was making them appear worse than they were; others believed she had suffered serious injury. Scientific analysis of the tape used to bind defendant found that some segments had been torn and some had been cut, but none had evidence of stretching. Examination of the knee-brace tool revealed no tape residue.

Robert's sister, Simone Adair, testified that sometime in early 1997 defendant told her she had found the gag used in her attack, and it was covered in blood and saliva. In June 1997, however, defendant asked Simone to tell the police that Simone was with defendant's father when the gag was discovered. When Simone told her she would not lie, defendant replied, "Well, then I'm screwed."

As to motive, both personal and financial, the prosecution presented evidence of defendant's extramarital affair with Shapiro, whom she wanted to be with if she could "get rid of Robert." In addition, defendant was uncertain if she wanted to move to Las Vegas, where Robert intended to relocate shortly. She also received approximately $400,000 in life insurance following Robert's death.

The defense took several tacks. Shapiro and his wife, Mindy, had recently begun divorce proceedings, apparently precipitated in large measure by his affair with defendant. Mindy was angry and vindictive and had stolen defendant's medical records and perhaps impersonated her over the telephone. Mindy had also talked about killing or severely injuring defendant and knew an alleged ex-convict in Las Vegas with ties to organized crime.

Other evidence tended to establish that someone impersonating a gas company employee was seen outside the Adair residence on the day in question. The individual may have resembled an ex-convict, Gary Pinuelas, who had a history of violence consistent with the injuries sustained by

defendant and Robert. Pinuelas and an associate, Robert Kugler, were observed five miles from the Adair residence an hour after the murder. According to one witness, Kugler resembled a man in a gas company uniform seen outside the Adair residence.

A Los Angeles Police Department criminalist opined that blood found on defendant's clothes was consistent with her having been beaten and that he would have expected Robert's blood to be on the bat. He also would have expected to see Robert's blood on the person who wielded the bat, and none was found on defendant's clothing.

On the question of motive, evidence established defendant had shortly before the murder settled a personal injury action in which she recovered $225,000.

### Factual Innocence Petition and Hearing

The jury found defendant not guilty. Thereafter, she petitioned the trial court pursuant to section 851.8, subdivision (e), for a finding of factual innocence.

In ruling on the petition, the court found as follows:

"So now what I have done is I have reviewed certain portions of the trial transcript, and I have a fairly good recollection of the evidence. I take very good notes while I am on the bench on my computer, and so I have reviewed my notes as well.

"I think significant in this case is—and I am going to rule based upon my independent review of the evidence, the weight to be given the evidence, including a consideration of the credibility of all witnesses who have testified. It's one thing to read it, it's another thing to be here and listen to it. And while some evidence might seem maybe less significant if viewed in the abstract by reading it, it becomes more significant when you're here to listen to it.

"I think significant in this court's mind is that there was no blood of the victim on Jeanie Adair's clothing, and that testimony came as a complete surprise to the district attorney, based on the statements [the prosecutor] made just after that.

"And the argument that Jeanie Adair had time to clean up, get into her car and drive off somewhere and dump the clothing and get rid of it so that there

wouldn't be any blood I don't think is borne out by the evidence. The only evidence that might suggest that is the officer—I can't remember his last name, started with a 'K.'

"[The Prosecutor]: Kreitzman.

"[The Court]: Kreitzman, one of the first witnesses to testify, that at some unspecified time he felt the hood of a car that was unidentified, other than it was in the garage and it was warm to the touch.

"There was no evidence of the weather conditions. I don't know what kind of car it was. I don't know whether a kind of car like that could be driven and 10 hours later still be warm to the touch in that particular garage on that particular day. I don't know.

"So there is no reasonable reason why there would be no blood on the clothing of the defendant.

"I would also note that Robert Adair was at the Wells Fargo Bank. Apparently, according to Jeanie Adair's statement that was introduced by the district attorney at trial, she dropped him off at a market near work so he could make a transaction and wire money to his mother. She had testified that she stated that, and there is some corroboration of the fact that he was going to send the money to the mother because, according to Adair's statements, she said that he had told her that there was a problem wiring the money.

"And so he obviously went to the Wells Fargo Bank at Maclay and Glenoaks, which was their major branch, and he was there at 10:52. At least, that's the time of the transaction. It would obviously take him some time to get from Sylmar Medical Center, assuming that's where he went, or he went to that Von's to make the transaction and then to Wells Fargo Bank.

"While he was there, he would have been at that branch at Maclay and Glenoaks for some period of time. Obviously, he was upset and trying to get the attention of people. He was banging on the bullet-proof glass, and they finally talked to him and explained to him that it's not feasible to wire a thousand dollars the way he wanted it, and suggested other procedures. And then he would have had to get back to Sylmar Medical Center. So I am considering that.

"I don't believe that there is any doubt that there was a gas company employee—not a gas company employee, but somebody disguised as a gas

company employee—that was on the premises on November the 5th of 1996. That's uncontroverted.

"There is absolutely no evidence to suggest that that was, in fact, a gas company employee that was simply there on a date that wasn't scheduled for a meter reading. If that was the case, we would have records to show that the meters were read on that day.

"I don't believe that Jeanie Adair's injuries were self-inflicted. That's based on my listening to the medical evidence here. I don't—I just don't think it's credible to believe that she could have inflicted particularly the injury to her back that required a rather dangerous surgery to repair that, and I don't see that there's any motive on the part of Jeanie Adair to murder her husband based on Jeanie Adair's infidelity. It might be the other case if Robert Adair had been the one who was cheating on his wife, but that wasn't the case.

"So considering everything, the court finds that there is no reasonable cause to believe that Jeanie Adair committed the offense with which the arrest was made; to wit, murder.

"And therefore, the petition to declare her factually innocent is granted."

The People appealed the granting of the petition. In resolving the appeal, the Court of Appeal applied a de novo standard of review, disagreeing with the substantial evidence test applied in *People v. Scott M.* (1985) 167 Cal.App.3d 688 [213 Cal.Rptr. 456] and *People v. Pogre* (1986) 188 Cal.App.3d Supp. 1 [234 Cal.Rptr. 590]. Independently examining the record, the court concluded "that defendant has failed to meet her burden [of establishing 'no reasonable cause exists to believe' she committed the charged offenses] and therefore the trial court exceeded its discretion in granting the petition." We granted defendant's petition for review to resolve the ostensible conflict among the Courts of Appeal.

## DISCUSSION

Pursuant to section 851.8, subdivision (e), "Whenever any person is acquitted of a charge and it appears to the judge presiding at the trial wherein such acquittal occurred that the defendant was factually innocent of such charge, the judge may grant the relief provided in subdivision (b)." Under subdivision (b), an acquitted defendant may petition for the sealing and destruction of any arrest records relating to the charge. The trial court then holds a hearing at which "the initial burden of proof shall rest with the

petitioner to show that no reasonable cause exists to believe that the [defendant] committed the offense [charged]. If the court finds that this showing of no reasonable cause has been made by the petitioner, then the burden of proof shall shift to the respondent to show that a reasonable cause exists to believe that the petitioner committed the offense [charged]." (§ 851.8, subd. (b) (hereafter section 851.8(b)).)[2] At the hearing, both the defendant and the district attorney may present evidence such as "declarations, affidavits, police reports, or any other evidence . . . which is material, relevant and

---

[2]The full text of section 851.8(b) states: "If, after receipt by both the law enforcement agency and the district attorney of a petition for relief under subdivision (a), the law enforcement agency and district attorney do not respond to the petition by accepting or denying such petition within 60 days after the running of the relevant statute of limitations or within 60 days after receipt of the petition in cases where the statute of limitations has previously lapsed, then the petition shall be deemed to be denied. In any case where the petition of an arrestee to the law enforcement agency to have an arrest record destroyed is denied, petition may be made to the superior court which would have had territorial jurisdiction over the matter. A copy of such petition shall be served on the district attorney of the county having jurisdiction over the offense at least 10 days prior to the hearing thereon. The district attorney may present evidence to the court at such hearing. Notwithstanding Section 1538.5 or 1539, any judicial determination of factual innocence made pursuant to this section may be heard and determined upon declarations, affidavits, police reports, or any other evidence submitted by the parties which is material, relevant and reliable. A finding of factual innocence and an order for the sealing and destruction of records pursuant to this section shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. In any court hearing to determine the factual innocence of a party, the initial burden of proof shall rest with the petitioner to show that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. If the court finds that this showing of no reasonable cause has been made by the petitioner, then the burden of proof shall shift to the respondent to show that a reasonable cause exists to believe that the petitioner committed the offense for which the arrest was made. If the court finds the arrestee to be factually innocent of the charges for which the arrest was made, then the court shall order the law enforcement agency having jurisdiction over the offense, the Department of Justice, and any law enforcement agency which arrested the petitioner or participated in the arrest of the petitioner for an offense for which the petitioner has been found factually innocent under this section to seal their records of the arrest and the court order to seal and destroy such records, for three years from the date of the arrest and thereafter to destroy their records of the arrest and the court order to seal and destroy such records. The court shall also order the law enforcement agency having jurisdiction over the offense and the Department of Justice to request the destruction of any records of the arrest which they have given to any local, state, or federal agency, person or entity. Each state or local agency, person or entity within the State of California receiving such a request shall destroy its records of the arrest and the request to destroy such records, unless otherwise provided in this section. The court shall give to the petitioner a copy of any court order concerning the destruction of the arrest records."

The subdivision refers to "arrestee" and "offense for which the arrest was made" because section 851.8 provides for the sealing and destruction of arrest records not only for a defendant acquitted after trial but also for "a person [who] has been arrested, and an accusatory pleading has been filed, but where no conviction has occurred . . . ." (*Id.*, subds. (c), (d).) Although our analysis applies equally to this latter circumstance, we will substitute "defendant" and "offense charged" where appropriate to avoid confusion in the context of this case.

reliable," including evidence previously suppressed pursuant to sections 1538.5 and 1539. (§ 851.8(b).) The statute further directs that "[a] finding of factual innocence and an order for the sealing and destruction of records pursuant to this section shall not be made unless the court finds that no reasonable cause exists to believe" the defendant committed the offense charged. (*Ibid.*)

 The controversy here concerns the proper standard of review on appeal from the trial court's finding of factual innocence. (See § 851.8, subd. (p).) Adopting the Court of Appeal's conclusion, the People argue that a de novo standard applies. (See *People v. Matthews* (1992) 7 Cal.App.4th 1052 [9 Cal.Rptr.2d 348].) Defendant contends the finding should be subject to the deferential substantial evidence test whereby a reviewing court will not substitute its judgment for that of the trial court if the circumstances reasonably support its ruling. (See *People v. Scott M., supra,* 167 Cal.App.3d at p. 699; see generally *People v. Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

Section 851.8 does not expressly set forth the applicable standard of appellate review. The statute does, however, define the necessary analytical context and therefore guides our inquiry. By its terms, section 851.8 precludes the trial court from granting a petition *"unless* the court finds that *no reasonable cause exists* to believe" the defendant committed the offense charged. (§ 851.8(b), italics added.) In other words, the trial court cannot grant relief if *any* reasonable cause warrants such a belief. (Cf. § 871 [at preliminary hearing, magistrate shall order the complaint dismissed if "it appears . . . that no public offense has been committed or that there is not sufficient cause to believe the defendant guilty of a public offense"].) " ' "Reasonable cause" ' " is a well-established legal standard, " 'defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' " (*People v. Rhinehart* (1973) 9 Cal.3d 139, 151 [107 Cal.Rptr. 34, 507 P.2d 642], disapproved on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396]; cf. *People v. Price* (1991) 1 Cal.4th 324, 410 [3 Cal.Rptr.2d 106, 821 P.2d 610] [under § 836, reasonable or probable cause to arrest "exists when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime"].) To be entitled to relief under section 851.8, "[t]he arrestee [or defendant] thus must establish that facts exist which would lead no person of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion that the person arrested [or acquitted] is guilty of the crimes charged. [Citation.]" (*People v. Matthews, supra,* 7 Cal.App.4th at p. 1056.)

█ Accordingly, the statutory scheme establishes an objective standard for assaying factual innocence. From this determination, it necessarily follows that a reviewing court must apply an independent standard of review and consider the record de novo in deciding whether it supports the trial court's ruling. Otherwise, the Legislature's directive that "[a] finding of factual innocence . . . shall not be made unless the court finds that no reasonable cause exists to believe" the defendant committed the offense charged (§ 851.8(b)) could readily be circumvented. As the Court of Appeal observed, "To [apply a substantial evidence test] would allow a trial court to ignore a set of facts that clearly established reasonable cause, as long as there were also facts that supported the possibility of innocence . . . ." The fact that the trial court may consider otherwise inadmissible evidence—such as police reports and evidence suppressed pursuant to section 1538.5—further reflects an intent to limit substantially the scope of relief under section 851.8, thus necessitating a more stringent standard of review.[3]

"Section 851.8 is for the benefit of those defendants who have not committed a crime. It permits those petitioners who can show that the state should never have subjected them to the compulsion of the criminal law—because no objective factors justified official action—to purge the official records of any reference to such action. . . . Hence, much more than a failure of the prosecution to convict is required in order to justify the sealing and destruction of records under section 851.8." (*People v. Scott M., supra,* 167 Cal.App.3d at pp. 699-700.) "Establishing factual innocence . . . entails establishing as a prima facie matter not necessarily just that the [defendant] had a viable substantive defense to the crime charged, but more fundamentally that there was no reasonable cause to arrest him in the first place."[4] (*People v. Matthews, supra,* 7 Cal.App.4th at p. 1056.) A trial court's finding of factual innocence based solely on its own interpretation of the evidence does not sustain the defendant's burden any more than a failure of the prosecution to convict. (See *ibid.*; cf. *People v. Glimps* (1979) 92 Cal.App.3d 315, 323-324 [155 Cal.Rptr. 230] [cataloguing reasons for dismissal of charges that do not establish factual innocence].)

Defendant contends the trial court's credibility determinations and other resolutions of factual conflicts should be dispositive on appeal. Although we agree that, as in analogous circumstances, the reviewing court should ordinarily consider itself bound by the trial court's factual findings to the extent

---

[3]For example, a defendant may have successfully moved to suppress a murder weapon found with his incriminating fingerprints, but the district attorney could properly submit such evidence at the section 851.8(b) hearing to negate a finding of factual innocence.

[4]In the context of a defendant who seeks a finding of factual innocence notwithstanding probable cause to arrest, facts subsequently disclosed may establish the defendant's innocence.

they are supported by substantial evidence, we do not accept defendant's extension of that premise to the imposition of a substantial evidence standard of review. For example, on review of a motion to suppress evidence pursuant to section 1538.5, " 'the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court.' " (*People v. Manning* (1973) 33 Cal.App.3d 586, 599 [109 Cal.Rptr. 531].) With regard to the constitutional standard of reasonableness, however, the appellate court is not bound by the lower court's findings but exercises its independent judgment on that question. (*Ibid.*) "The constitutional precept of 'reasonableness' as to searches and seizures is not a 'fact' which can be 'found' or not found in any given case. Rather, it is a standard, a rule of law, external, objective and ubiquitous, to be applied to the facts of all cases. [Citations.]" (*Ibid.*)

This same reasoning applies to a finding of factual innocence; whether "no reasonable cause exists" is an objective question measured by an external standard—would "no person of ordinary care and prudence . . . believe or conscientiously entertain any honest and strong suspicion that the person arrested [or acquitted] is guilty of the crimes charged"? (*People v. Matthews, supra,* 7 Cal.App.4th at p. 1056.) For example, in a rape prosecution the victim may testify she did not consent to an act of sexual intercourse, and the defendant may counter that she did. Following acquittal, the trial judge may determine not simply that the defendant succeeded in raising a reasonable doubt as to the victim's veracity but that, in fact, she was lying, and on that basis make a finding of factual innocence that would be binding on review if supported by substantial evidence. In other cases, however, the defendant may still fail to establish factual innocence under the foregoing standard even after taking into account the trial court's credibility determinations or other factual findings.

In arguing for a substantial evidence test, defendant relies in large measure on the analytical framework applied in determining the appropriate standard of review for mixed questions of law and fact. (See, e.g., *People v. Cromer* (2001) 24 Cal.4th 889, 894-901 [103 Cal.Rptr.2d 23, 15 P.3d 243].) Because a finding of factual innocence is fact intensive and does not implicate any constitutional right, she contends a deferential standard should apply. (See *Thompson v. Keohane* (1995) 516 U.S. 99, 113-114 [116 S.Ct. 457, 465-466, 133 L.Ed.2d 383].) Defendant's analysis, however, does not take account of the statutory language we are bound to effectuate in resolving this question. ▪ Whether or not a constitutional right is at issue, a finding of factual innocence "*shall not be made unless* the court finds that no reasonable cause exists to believe" the defendant committed the offense charged. (§ 851.8(b), italics added.) We are not at liberty to apply a standard

of review inconsistent with this legislative mandate. A reviewing court cannot consider whether the finding meets this standard without independently reviewing the record to determine "that facts exist which would lead no person of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion that the person arrested [or acquitted] is guilty of the crimes charged. [Citation.]" (*People v. Matthews, supra,* 7 Cal.App.4th at p. 1056.) Moreover, even when the underlying inquiry is fact intensive—as, for example, with the preliminary hearing—reviewing courts may nonetheless apply an objective standard of review. (See, e.g., *In re Watson* (1972) 6 Cal.3d 831, 836-837 [100 Cal.Rptr. 720, 494 P.2d 1264].)

Defendant also relies on *People v. Scott M., supra,* 167 Cal.App.3d 688, and *People v. Pogre, supra,* 188 Cal.App.3d Supp. 1. Although these decisions contain language that might support a substantial evidence test, careful analysis reveals a proper understanding that independent review is required.

In *People v. Scott M.,* the defendant petitioned for a finding of factual innocence after a jury acquitted him of rape and related charges. The trial court denied the petition, concluding that while the verdict was appropriate given the victim's embellishment of her testimony, " 'defendant was [not] shown by the facts to be factually innocent.' " (*People v. Scott M., supra,* 167 Cal.App.3d at p. 697.) On appeal, the Court of Appeal upheld the ruling, correctly noting that "[t]he trial court does not 'disagree' with the jury's verdict when it denies a section 851.8 petition. It refines that verdict by distinguishing between those cases where acquittal is based upon actual innocence and those where acquittal is based upon the prosecution's failure of proof." (*Id.* at p. 699.) The court also articulated the proper measure of "reasonable cause." (*Ibid.*) It then stated, "[I]n reviewing a lower court's determination of reasonable cause, we will not substitute our judgment for that of the trial court. Hence, the trial court ruling will not be set aside if there exists some 'rational ground for assuming the possibility that an offense has been committed and that the defendant is guilty of it.' [Citation.]" (*Ibid.*) This may misleadingly suggest a substantial evidence test because the question arose in the context of the *denial* of a section 851.8 petition. Since the statute precludes a finding of factual innocence if *any* reasonable cause exists to believe the defendant committed the charged offense, in the case of a denial both the trial court and the reviewing court make the same inquiry. This appears to conflate independent review with the substantial evidence test because the appellate court may approach its task in either of two ways: It may examine the record de novo to determine whether the defendant failed to meet the burden of "show[ing] that no reasonable cause exists to believe" the defendant committed the charged offense

(§ 851.8(b); see, e.g., *People v. Matthews, supra,* 7 Cal.App.4th at pp. 1057-1063), or it may assess whether the trial court's conclusion to that effect is supported by substantial evidence. Whichever the choice, the analytical perspective is ultimately the same, and the statutory standard is satisfied.

In *People v. Pogre, supra,* 188 Cal.App.3d Supp. 1, the trial court granted the defendant's petition for a finding of factual innocence based on her defense of entrapment to soliciting an act of prostitution.[5] In reviewing this ruling, the appellate department—as did the Court of Appeal in *People v. Scott M., supra,* 167 Cal.App.3d 688—correctly recognized that the statute sets forth the applicable standard for determining factual innocence and that reasonable cause is defined in objective terms based upon the perceptions of a person " 'of ordinary care and prudence . . . .' " (*Pogre,* at p. Supp. 9.) Implying a substantial evidence standard of review, however, the court then stated, "It goes without saying that the trial court has broad discretion to determine whether the standard required by section 851.8 has been met." (*Ibid.*) Nevertheless, it independently reviewed the facts and concluded, in light thereof, "that a man of ordinary care and prudence would have been led to believe and conscientiously entertain an honest and strong suspicion that the defendant was there to commit an act of prostitution, i.e., sex for money, and was by both word and deed doing her best to solicit such an act . . . ." (*Ibid.*) Thus, while the court mistakenly invested the trial court with discretion in making a finding of factual innocence, it considered the record de novo to determine whether " 'no reasonable cause exist[ed] to believe' " the defendant had committed the charged offense, the standard compelled by the terms of the statute. (*Ibid.*)

From this analysis, we conclude that the courts in both *People v. Scott M.* and *People v. Pogre* reached correct results under the appropriate statutory standard, notwithstanding some imprecision in their language.[6] The terms of section 851.8(b)—precluding a finding of factual innocence "unless no reasonable cause exists"—impose an objective legal standard on both trial and appellate courts, and do not accommodate any exercise of discretion to which the appellate court should defer. Thus, these decisions do not assist defendant's argument.

■ This case aptly illustrates the necessity of de novo review to vindicate the statutory standard for a finding of factual innocence. In granting

---

[5]The trial court had previously granted the defendant's motion for acquittal pursuant to section 1118.1 on the same evidence.

[6]To the extent they are inconsistent with our analysis, *People v. Scott M., supra,* 167 Cal.App.3d 688, and *People v. Pogre, supra,* 188 Cal.App.3d Supp. 1, are disapproved.

defendant's petition, the trial court noted several facts and circumstances supporting its interpretation of the evidence that defendant did not kill Robert. (See *ante*, at pp. 900-902.) Ultimately, however, its conclusions amounted to no more than inferences and deductions that support a finding of reasonable doubt. Whether considered singly or collectively, the cited facts and circumstances fail "to show that [no] reasonable cause exists to believe that [defendant] committed the offense" charged. (§ 851.8(b); *People v. Matthews, supra*, 7 Cal.App.4th at p. 1056.) " '[F]actually innocent' as used in [section 851.8(b)] does not mean a lack of proof of guilt beyond a reasonable doubt or even by 'a preponderance of evidence.' [Citation.]" (*People v. Glimps, supra*, 92 Cal.App.3d at p. 322.) Defendants must "show that the state should never have subjected them to the compulsion of the criminal law—because no objective factors justified official action . . . ." (*People v. Scott M., supra*, 167 Cal.App.3d at p. 700.) In sum, the record must exonerate, not merely raise a substantial question as to guilt. (Cf. § 851.8, subds. (f), (h).)

Defendant did not meet this burden. Not only did the Court of Appeal find that "there was clearly enough evidence[, albeit circumstantial,] to have allowed the jury to convict defendant"; it further noted that at oral argument defense counsel "conceded there was sufficient evidence to sustain a conviction on appeal." The court also identified several facts and circumstances that would cause a person " 'of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that [defendant] is guilty of a crime.' " (*People v. Rhinehart, supra*, 9 Cal.3d at p. 151.) For example, "even the strongest piece of evidence in [defendant's] favor, her back injury which required surgery, was conceded by her surgeon to be a condition that could have arisen without any injury. [¶] . . . [Additionally,] one reasonable interpretation of the evidence strongly suggests that defendant bludgeoned her husband to death and concocted a story to cover her crime. It is also reasonable to find from evidence presented that defendant constantly changed her explanation of what had taken place, had made telephone calls when she claimed to have been tied up, and claimed to have freed herself from her confinement in a manner inconsistent with common sense and the scientific evidence presented. [¶] Further, this reasonable view of the evidence also suggests defendant had personal and financial motivation to kill her husband and that she tried to have witnesses lie to the police. No explanation was given to explain why, if defendant was the intended victim, she was allowed to live and Robert was killed."

We agree with this assessment of the record and with the conclusion the trial court erred in making a finding of factual innocence.

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.