Filed 11/18/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW TIMOTHY O'DAY,<br><br>    Defendant and Appellant. | A162303<br><br><br>(Sonoma County Super. Ct.<br>No. SCR5269391) |


The prosecution charged Matthew Timothy O'Day with murder and assault with a deadly weapon; the magistrate thereafter dismissed the charges at the conclusion of a preliminary hearing. More than 12 years later, O'Day petitioned for a finding of factual innocence. (Pen. Code, § 851.8; undesignated statutory references are to this code.) The trial court denied the petition both because it was untimely without good cause and O'Day failed to satisfy his stringent burden of establishing his factual innocence. We affirm. We conclude the trial court did not abuse its discretion in determining the petition was untimely and unsupported by a showing of good cause.

1

# BACKGROUND

On the evening of December 14, 2007, about 40 people — many of whom were drinking alcohol and smoking marijuana — attended a house party in Santa Rosa.[1]  Much of the party took place in the living room, which was dark and illuminated principally by a strobe light.  Desiree F., then about 20 years old, arrived at the party at approximately 11:30 p.m. and had a shot of vodka.

Desiree saw O'Day arrive at the party with two other young men, Alex Hopper and Donald Bittner.  Other partygoers also saw the three young men arrive together.  Desiree knew O'Day — they had gone to high school together — and they spoke briefly in the kitchen.  About 15 minutes later, in the early morning of December 15, a fight broke out in the living room.  Three people were stabbed, and Ben Floriani was killed.  Several partygoers saw O'Day flee after the stabbing.

Police arrived and interviewed partygoers who gave varying accounts about what had happened.  Several witnesses identified Hopper and Bittner as being involved in the attack on Floriani.  Desiree did not talk to police at the scene.  But several hours later, she went to the police station and voluntarily submitted to an interview.  Desiree told the police O'Day arrived at the party with Hopper.  She described the incident in detail and said she saw O'Day make a stabbing motion towards Floriani's chest before fleeing with Hopper.  Desiree witnessed the stabbing from a distance of 5 to 10 feet.  When shown a photo array, Desiree circled O'Day's photo and wrote "Alex" underneath it, but then scribbled his name out.  She confidently told the

---

[1] Our summary of the offenses is derived from the preliminary hearing transcript and evidence admitted at the hearing, including police reports and witness interviews.

officer, "[t]hat's the guy, I know it, that's him." Desiree was "more than . . . a hundred and ten percent positive" she had described what she witnessed at the party.

A few days later, the prosecution arrested O'Day and charged him and three codefendants — Hopper, Bittner, and Noah Minuskin — with crimes arising out of the incident. In April 2008, the prosecution filed a first amended complaint charging O'Day, Hopper, and Bittner with murder; O'Day and Hopper with personal use of a deadly weapon; and O'Day, Hopper and Bittner with assault by force likely to produce great bodily injury. The amended complaint charged Hopper with three additional counts of assault with a deadly weapon and sentencing enhancements, and it charged Minuskin with being an accessory after the fact.

Numerous witnesses testified at the preliminary hearing, which was held over several months in the summer of 2008. Desiree testified she was not wearing her glasses when Floriani was stabbed — a fact she had not disclosed during her interview — and without them, a person would appear slightly fuzzy at a distance of 9 or 10 feet. During the police interview, the incident was "fresh" in Desiree's mind because it had "just happened." She told the officer the truth about the incident. Later — after speaking with a defense investigator and thinking "long and hard about it" — Desiree testified she had "said the wrong thing" and "put the wrong name on the face or the face on the wrong name." She testified O'Day was near the kitchen when the stabbing occurred, and some of the things she told the officer during the interview may not have happened.

At the conclusion of the preliminary hearing in August 2008, the magistrate described the case as "difficult . . . to rule on from an evidentiary standpoint," as nearly all percipient witnesses had consumed alcohol and

3

marijuana and the lighting conditions were "extremely poor." Many witnesses, the magistrate explained, were easily influenced by news accounts and discussions with other witnesses, and some witnesses were "immature" in that they gave information to law enforcement because they felt a "need to be part of the incident."

The magistrate noted that, of the testimony presented by dozens of witnesses, only Desiree identified O'Day as being involved in Floriani's murder. Desiree was "inconsistent in her direct and cross-examination," and she admitted "what she had told the police about Mr. O'Day was not true today and she was mistaken about [him]." The magistrate acknowledged Desiree's statement to police implicated O'Day but concluded her preliminary hearing testimony was "contrary to her original statement," her original observations were made in a dark room without the aid of her glasses, and her observations were "inconsistent with every other witness that testified." Thus, not "having found any credible evidence" against O'Day, the magistrate dismissed the charges against him.

In September 2020 — more than 12 years later — O'Day petitioned for a finding of factual innocence. At the outset, he acknowledged the petition was filed after the expiration of the two-year deadline in section 851.8. But he argued there was good cause for the delay because he was unaware, until 2018, he could seek relief. In a supporting declaration, O'Day explained that upon his release from custody, his privately retained attorney said the prosecution could refile the charges as "there was no statute of limitations for the crime of murder." Although defense counsel did not expect the prosecutor to refile the charges, he advised O'Day to stay in California and notify him if he planned to leave the state. O'Day and counsel also discussed what could be done about his arrest record; counsel said O'Day's employers could not

4

"discriminate" against him because of the arrest, but counsel did not mention a petition for factual innocence. Had O'Day known of that remedy, he would have asked counsel to file a petition "immediately."

In the years that followed, O'Day recovered from the emotional trauma of his pretrial detention, and he worked to put his life back together by attending college and gaining employment. Along the way — in 2014 and 2015 — O'Day had two experiences alerting him to the adverse consequences of his arrest. While working for a sheet metal fabricator, O'Day attempted to deliver ductwork to an air force base. When he tried to enter the base, he was "interrogated by three military police officers" and denied gate clearance because of his arrest. To keep his job (and prove to his employer the charges had been dismissed), O'Day went to the courthouse and obtained a printout of the criminal docket. Thereafter, he had a similar experience when another employer learned he had been arrested; again he had to provide the employer with a copy of the criminal docket to keep his job.

O'Day enrolled in law school in 2016. In 2018, during his third year of law school, O'Day participated in a criminal justice clinic where he visited clients in prison. That year, his prison gate clearance was revoked because of his arrest. At that point, his supervising attorney urged him to consider filing a petition for factual innocence. It was then O'Day first learned of "such a remedy." In the fall of 2018, the public defender agreed to file a petition for factual innocence on his behalf, but it was not until two years later — after delays caused by several circumstances, including the COVID-19 pandemic — that counsel filed the petition.

O'Day next asserted he was entitled to a finding of factual innocence because the evidence at the preliminary hearing was inadequate for a holding order and "would not leave a person of ordinary care and prudence to believe

5

there was an honest or even slight suspicion [he] was guilty." In the petition and in a supporting declaration, O'Day insisted the lack of credible evidence presented by the prosecution at the preliminary hearing "exonerated him and proved his innocence."

The prosecution opposed the motion. At the hearing on the petition, O'Day offered no additional evidence. Thereafter, the trial court issued a written order denying the petition. It first found O'Day filed the petition long after the two-year limitations period expired and he failed to establish good cause for the delay. The court acknowledged the challenges O'Day faced as a result of his pretrial incarceration, his laudable educational and employment achievements, and the fact that trial counsel did not advise him of the possibility of filing a petition for factual innocence. But the court found those circumstances did not constitute good cause, as O'Day had not asserted "he was counseled that he *could not* file such a petition. At no point was there any legal impediment or barrier" to filing a petition, nor circumstantial condition preventing the filing of the petition "such as incarceration or medical inability." And, the court observed, there were numerous instances over the preceding 12-year period when O'Day "was reminded of his prior arrest via an embarrassing confrontation with an employer or a security agency, any of which would have served as inspiration to seek relief. Yet, it was not until an incident involving the denial of gate clearance at a state prison" that O'Day — a third-year law school student — "sought information on relief from the prior arrest."

The trial court next denied the petition on the merits. It described Desiree's confident and detailed identification of O'Day, the doubt she experienced after being interviewed by a defense investigator, and her preliminary testimony that she was mistaken in her identification. The court

6

acknowledged the magistrate had discharged O'Day, but it determined he failed to establish no reasonable cause existed to believe he committed the offenses for which he was arrested. It reasoned he "was present at the scene on the night in question, and was identified by an eye witness, who appeared to be reliable and without apparent reason to lie, as being involved. That no other witnesses saw what she described is not conclusive in light of the statements made by all the witnesses[.]" In sum, the court concluded O'Day had not demonstrated he never should have been subject "to the compulsion of the criminal law, that there was no reasonable cause to arrest him in the first place, or that the record not only raises substantial questions as to guilt, but fully exonerates him."

## DISCUSSION

"Section 851.8 establishes the guidelines for sealing and destroying the arrest records of a person who is factually innocent." (*People v. Bermudez* (2009) 172 Cal.App.4th 966, 969.) The statute provides, in "any case where a person has been arrested, and an accusatory pleading has been filed, but where no conviction has occurred, the defendant may, at any time after dismissal of the action, petition . . . for a finding that the defendant is factually innocent of the charges for which the arrest was made." (§ 851.8, subd. (c).) A finding of factual innocence, however, shall not be made unless the trial court "finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made." (*Id.*, subd. (b).) The defendant bears the initial burden of proof to show no such reasonable cause exists. (*Ibid.*) If the defendant makes the required showing, the burden of proof shifts to the prosecution to show the existence of reasonable cause. (*Ibid.*)

7

For arrests and accusatory pleadings filed after January 1, 1981, a section 851.8 petition "may be filed up to two years from the date of the arrest or filing of the accusatory pleading, whichever is later. . . . Any time restrictions on filing for relief . . . may be waived upon a showing of good cause by the [defendant] and in the absence of prejudice." (§ 851.8, subd. (*l*).) A trial court has "broad discretion to determine whether good cause exists" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037), and its discretionary determinations are typically reviewed for abuse of discretion. (*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1123.) A trial court abuses its discretion when it acts " ' "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 924.)

The two-year limitations period imposed in section 851.8, subdivision (*l*) — which applies to all petitions brought under the statute — "guards against the presentation of stale claims of factual innocence and encourages a swift conclusion to section 851.8 petitions." (*People v. Bermudez*, *supra*, 172 Cal.App.4th at pp. 970, fn. 5, 972.) But as stated above, the statutory deadline " 'may be waived upon a showing of good cause by the [defendant] and in the absence of prejudice.' " (*Id.* at p. 970; *People v. Gerold* (2009) 174 Cal.App.4th 781, 786.) O'Day seems to assume the statutory limitations period began to run when the charges against O'Day were dismissed. Not so. A factual innocence petition must be filed within two years from the "date of the arrest or filing of the accusatory pleading, whichever is later." (§ 851.8, subd. (*l*); *Bermudez*, at p. 972.) Here, the two-year limitations period began to run no later than April 2008 — when the first amended complaint was

filed — and it expired no later than April 2010. (See *Gerold*, at p. 786.) The petition, filed more than a decade later, was untimely.

But that does not end our inquiry. We must decide whether the trial court abused its discretion in concluding O'Day failed to satisfy his burden to demonstrate good cause for the late-filed petition. Section 851.8 does not define good cause and O'Day does not proffer a definition. *People v. Drew* (2017) 16 Cal.App.5th 253 (*Drew*) — not cited by the parties — provides guidance. There, the court considered whether a defendant petitioning to recall his sentence under section 1170.126, enacted as part of the Three Strikes Reform Act of 2012 (Act), established good cause for failing to file the petition by the statutory deadline. Like the statute at issue here, section 1170.126 authorizes a defendant to petition for relief within two years of the date of the Act " 'or at a later date upon a showing of good cause.' " (*Drew*, at p. 256.)

At the outset, *Drew* observed that section 1170.126's inclusion of "a limitations period subject to a 'good cause' exception" constituted an implied determination "that not every delay in filing a recall petition would be excusable." (*Drew*, *supra*, 16 Cal.App.5th at p. 257.) *Drew* next acknowledged the statute did not define good cause but noted courts had identified several relevant factors, including " '(1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to [the opposing party] that is likely to result from the delay.' " Courts must also "consider all of the relevant circumstances of the particular case, 'applying principles of common sense to the totality of circumstances.' " (*Ibid.*)

Applying these factors, *Drew* held the trial court did not abuse its discretion in finding the defendant failed to show good cause for the late-filed

9

petition. (*Drew, supra*, 16 Cal.App.5th at p. 260.) The delay was "substantial" (*id*. at p. 258) and the defendant did nothing "to investigate potential relief for three and one-half years" between the effective date of the Act and the filing of the petition "even though he was then serving a life sentence that at least arguably was impacted by the [Act]. He did not contact the court. He did not request assistance from the public defender's office that previously represented him. He did not inquire of anyone at the Department of Corrections and Rehabilitation. Certainly, we do not suggest a good cause showing requires that an untutored layman such as [the defendant] undertake yeoman efforts in an effort to navigate the intricacies of the [Act]. But neither do we accept [defendant's] claim on appeal that faced with years during which there is no hint of activity or even de minimus effort by the inmate to protect his rights, a trial court abuses its discretion when it determines there is no good cause to dispense with the legislatively prescribed deadline for filing recall petitions." (*Drew*, at p. 260.)

*Drew* was likewise unpersuaded by the defendant's assertion that there was good cause because he lacked counsel, and he promptly filed his petition for recall after learning of the potential for resentencing. (*Drew, supra*, 16 Cal.App.5th at p. 259.) This argument, the court reasoned, advocated for "no time limits for filing a recall petition as long as no one told him he had the ability to request resentencing. Were this contention accepted, it would be tantamount to erasing the limitations period from the statute in all but the most unusual of circumstances." (*Ibid*.) In light of the lengthy delay, and the defendant's inactivity "unexplained except by the absence of a lawyer proactively advising him regarding his rights and remedies," *Drew* held it was not an abuse of discretion for the trial court to conclude the defendant failed to show good cause for the untimely petition. (*Id*. at p. 260.)

10

Here, too. As the trial court acknowledged, the delay in filing the petition was "substantial." (*Drew*, *supra*, 16 Cal.App.5th at p. 258.) The charges were dismissed in August 2008 and the statute of limitations expired no later than April 2010. Nevertheless — despite feeling constant humiliation — O'Day did nothing to "investigate potential relief" or "protect his rights." (*Id.* at p. 260.) The court also noted O'Day had experiences in 2014 and 2015 during which he suffered the adverse consequences of his arrest, experiences that — in the court's view — should have spurred him to investigate an avenue for relief.[2] Yet there is no evidence he asked the court, the privately retained attorney who previously represented him, or the public defender's office for assistance in ameliorating these consequences. Not even when he twice went to the courthouse to retrieve a copy of the criminal docket. It was not until 2018 that O'Day sought assistance from the public defender. The record permits a reasonable inference that his delay in seeking relief was attributable, in least in part, to his desire to avoid calling undue attention to his case lest the prosecutor refile the murder charge. (See *id.* at p. 259, fn. 4.)

We acknowledge the emotional challenges O'Day faced after being held in pretrial custody for charges that were later dismissed, and we commend him on prioritizing employment and education upon his release. But we cannot conclude it was an abuse of discretion for the trial court — after

---

[2] The dissent faults the trial court for failing to "consider whether O'Day's inaction was objectively reasonable," and suggests the court committed "legal error." (Dis. opn. of Tucher, P. J., *post*, at p. 6.) We respectfully disagree. The court considered O'Day's substantial delay in filing the petition as well as his reasons for the delay. The court also concluded that — in 2014 and 2015 — incidents occurred "which would have served as inspiration to seek relief." The court thus impliedly determined O'Day's inaction was objectively unreasonable.

11

reviewing the length of the delay, the proffered justification for the delay, and the relevant circumstances of the case — to find O'Day did not show good cause.[3]  (See *People v. Valencia*, *supra*, 64 Cal.App.5th at p. 644 [inmate's rehabilitative progress does not, as a matter of law, "constitute good cause to excuse an untimely filing" under section 1170.126].)  A delay beyond the statutory deadline carries "consequences, and 'good cause' functions as a barometer to evaluate the excuse for the delay and decide whether to obviate those consequences." (*Drew*, *supra*, 16 Cal.App.5th at p. 258.)

In his reply brief, O'Day urges us to look to habeas corpus jurisprudence and measure the delay from the date he knew, or reasonably should have known, of the legal basis for filing the factual innocence petition. (See *In re Robbins* (1998) 18 Cal.4th 770, 784, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720.)  We question the wisdom of such an approach for the reason articulated in *Drew*, namely that such an approach "would be tantamount to erasing the limitations period from the statute in all but the most unusual of circumstances."  (*Drew*, *supra*, 16 Cal.App.5th at p. 259; but see *People v. Bermudez* (1989) 215 Cal.App.3d 1226, 1228–1230 [assuming without deciding delay attributable to unrepresented defendant's ignorance of the law was "excusable"].)  But even

---

[3] Prejudice from the delay is a relevant consideration, but we have no occasion to consider that factor as the prosecution did not argue prejudice. We also express no opinion on whether the existence of a legal impediment or barrier — such as incarceration or incapacity — may be relevant to the good cause determination.  (See *People v. Gerold*, *supra*, 174 Cal.App.4th at p. 786; *People v. Valencia* (2021) 64 Cal.App.5th 641, 648.)  An obvious example of good cause for exceeding the statutory deadline would arise when exonerating evidence is discovered more than two years after the case is resolved in the defendant's favor.  (See *People v. Adair* (2003) 29 Cal.4th 895, 905, fn. 4.)  Here, no circumstances prevented O'Day from timely filing the petition, and he offered no newly discovered exonerating evidence.

if we adopt the broad standard advocated by O'Day, we would still affirm; the record permits a reasonable inference that, as far back as 2014 and 2015, O'Day reasonably should have known of the need to investigate potential avenues for relief.[4]

The trial court determined O'Day failed to demonstrate good cause for the delay in filing the petition for factual innocence. Having carefully reviewed the record and the parties' briefing, we cannot conclude the court abused its discretion. Reaching this result is not so much about how "generously" we interpret good cause. (Dis. opn. of Tucher, P. J., *post*, at p. 1.) Rather, under the applicable standard, our review is deferential — we reverse a trial court's discretionary decision only when it is "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) We cannot say that here.

Our conclusion makes it unnecessary to address O'Day's contention that the trial court erred in concluding he did not meet his burden of establishing factual innocence, but we observe — and the Attorney General agrees — O'Day appears to be eligible for relief under Senate Bill No. 731

---

[4] The dissent correctly recites the standard for evaluating the timeliness of a petition for habeas corpus — " 'when the petitioner *or his counsel* knew or reasonably should have known the legal basis of the claim and facts in support of that claim.' " (Dis. opn. of Tucher, P. J., *post*, at pp. 2, 5, italics added.) But even under that standard the petition is untimely as the record affords an uncontradicted inference that, in 2008, O'Day's trial counsel *should have known* of the procedure to petition for factual innocence and facts supporting such a petition. Additionally — and contrary to the dissent's suggestion — the *Drew* court *disclaimed* an intention to rely on the habeas standard when evaluating good cause. (Compare *Drew*, *supra*, 16 Cal.App.5th at p. 259 with dis. opn. of Tucher, P. J., *post*, at pp. 1–2.) We do as well. As stated above, that standard would functionally eliminate the legislatively prescribed limitations period for factual innocence claims, as defendants in all but the rarest of cases may allege no one advised them of the availability of a petition for factual innocence. (*Drew*, at p. 259.)

13

(2021–2022 Reg. Sess.; Stats. 2022, ch. 814, § 4), which will add section 851.93, subdivision (a)(2)(C)(ii), operative July 1, 2023.

## DISPOSITION

The order denying the petition for factual innocence is affirmed.

_____

Rodríguez, J.

I CONCUR:

_____

Petrou, J.

A162303

TUCHER, P. J., Dissenting.

O'Day has a plausible claim of factual innocence, since a magistrate heard all of the evidence against him at a preliminary hearing in 2008 and concluded there was "not . . . any credible evidence" he committed the murder. (See *People v. Adair* (2003) 29 Cal.4th 895, 904–905; *People v. Esmaili* (2013) 213 Cal.App.4th 1449, 1456–1460.) But we do not consider the claim on its merits because O'Day did not file his petition until September 2020, some 12 years and nine months after he was arrested and charged with the crime. Penal Code section 851.8 requires that a petition be filed within two years of the later of these events, except "upon a showing of good cause by the petitioner and in the absence of prejudice." (Pen. Code, § 851.8, subd. (l); undesignated statutory references are to the Penal Code.) Here, the People have not argued prejudice and, until today, no published decision has construed "good cause" as used in section 851.8. I would interpret good cause more generously than do my colleagues. Specifically, I would find good cause excuses the decade-long delay attributed to petitioner being unaware that California law allows for such a thing as a petition for factual innocence, or indeed that the law offers any potential remedy for the difficulties his arrest continues to cause. I would also, because the trial court took a different view, vacate at least that portion of the court's order that denies the petition for factual innocence as untimely.

"Good cause" is a capacious term, and like the majority I would look to factors other courts have considered in deciding when to excuse a delay for "good cause." The majority embraces three factors derived from our speedy-trial jurisprudence. (See maj. opn. *ante,* at p. 9, citing *People v. Drew* (2017) 16 Cal.App.5th 253, 257 (*Drew*) [drawing on cases interpreting section 1382].) In addition to these, I would also, as does *Drew*, consider the

1

timeliness standard for a petition for writ of habeas corpus. (See *Drew*, at p. 259.)

With a habeas petition, "the trigger for timeliness is when the petitioner or his counsel knew or reasonably should have known the legal basis of the claim and facts in support of that claim." (*In re Douglas* (2011) 200 Cal.App.4th 236, 243 (*Douglas*), citing *In re Robbins* (1998) 18 Cal.4th 770, 780 (*Robbins*).) This is "an objective, reasonable person standard," not one that tolerates willful ignorance. (*Douglas*, at p. 244.) Once alerted to the possibility of a claim, a petitioner must act without substantial delay, or must demonstrate either "good cause for the delay" or that "the claim falls within an exception to the bar of untimeliness." (*Id.* at pp. 242–243.) And a petitioner who was previously represented by counsel was "entitled to rely on his . . . counsel's judgment," as to whether he had a valid claim. (*In re Hampton* (2020) 48 Cal.App.5th 463, 476 (*Hampton*) [vacating conviction of defendant "unaware of his entitlement to [a heat of passion] instruction" until given legal authority by a fellow prisoner].)

This timeliness standard, based on objective reasonableness, doomed the habeas petition in *Douglas*. In 1997, Douglas pleaded no contest to a misdemeanor that required him to register as a sex offender. (*Douglas*, *supra*, 200 Cal.App.4th at p. 240.) The next day he signed a form advising him about the registration requirement, and a deputy advised him orally before releasing him from custody. (*Id.* at p. 241.) Thirteen years later, Douglas brought a petition for writ of habeas corpus on the grounds that, prior to entering his plea, he had not been advised of the registration requirement. (*Id.* at p. 240.) The trial court granted the writ but the Court of Appeal reversed, concluding Douglas's petition was untimely. (*Id.* at pp. 241–242.) As the appellate court explained, Douglas "likely knew of the

registration requirement on the day after he entered his plea, . . . and if he truly did not, as he claims, he *should have known*." (*Id*. at p. 243.) Douglas "deliberately chose not to seek counsel," instead "relying on his *unreasonable* mistaken belief" that the registration requirement did not apply to him. (*Id*. at p. 244, italics added.)

By analogy to the same objective reasonableness standard, Drew's petition to recall his sentence pursuant to the Three Strikes Reform Act of 2012 (TSRA) also failed as untimely. (*Drew*, *supra*, 16 Cal.App.5th at p. 255.) The TSRA set a November 7, 2014 deadline for filing such petitions, unless a petitioner established " 'good cause' " for a delayed filing. (*Drew*, at p. 255.) Drew did not file his petition until almost two years after the deadline, although he knew about the TSRA earlier. (*Drew,* at p. 255.) In the trial court, Drew explained the untimeliness of his petition as a consequence of his belief that his other life terms rendered him ineligible for relief. (*Ibid*.) This was a *subjective* mistake that was not reasonable, the Court of Appeal explained, so it did not "provide *objective* good cause for delay." (*Id*. at p. 259 [Drew would have had a "well-supported argument" he was eligible, with "no legal downside to" timely filing].) Moreover, on appeal Drew conceded that the real reason he failed to file a timely petition was simply that he had no "lawyer proactively advising him regarding his rights and remedies." (*Id*. at p. 260.) The trial court did not abuse its discretion in finding this fell short of " 'good cause,' " *Drew* holds. (*Ibid*.)

O'Day's case differs from Douglas's and Drew's in that O'Day's failure to discover his claim within the statutory period was neither willful ignorance nor objectively unreasonable. O'Day had an attorney when the court dismissed the charges against him, with whom he discussed "at length" the future consequences of his arrest record, but all the attorney had to offer on

3

the subject was that "it would be illegal for an employer to discriminate against [O'Day] because of" his arrest. The attorney did not tell O'Day of a potential remedy in the form of a petition for factual innocence. Had he known of it, O'Day represents he would have asked his lawyer to file a petition "immediately." Unlike Douglas, then, O'Day did not ignore information that was clearly provided to him. Unlike Drew, O'Day was completely unaware of the statutory remedy he would later invoke. Where Drew knew about the TSRA and thus could reasonably be charged with a failure to investigate his claim under it, O'Day actually took an initial step to investigate whether he could do anything about his arrest record, discussing the subject with his then-lawyer. In that discussion O'Day was left with the impression (though not expressly told) that there was nothing he could do about it. Based on his having received this at-best incomplete advice (see *Hampton*, *supra*, 48 Cal.App.5th at p. 476), and because a petition for factual innocence is a legal procedure beyond the ken of the normal layperson, O'Day's failure to investigate a claim he did not know he had was objectively reasonable. In my view, O'Day cannot be charged with knowing he had a claim until, much later, the possibility of a petition for factual innocence was brought to his attention. The Attorney General accuses O'Day of having "slept on his rights," when it would be more accurate to say he was completely unconscious of them. The difference is between one who has been alerted to the possibility of his claim, and one like O'Day, who has not. (See *Douglas*, *supra*, 200 Cal.App.4th at p. 242.)

The majority rejects this analysis with two arguments that merit response. First, the majority points out that petitioner's trial counsel in 2008 should have known of the possibility of a petition for factual innocence. (See maj. opn. *ante,* at p. 13, fn. 4.) I agree, but do not think counsel's constructive

4

knowledge has any bearing on this case, after his engagement to defend petitioner against these criminal charges ended.[1]

Second, the majority characterizes *Drew* as having "*disclaimed* an intention to rely on the habeas standard." (Maj. opn. *ante,* at p. 13, fn. 4.) I read *Drew* differently. The *Drew* court explicitly relies on *Douglas*, noting it is a habeas case. (See *Drew*, *supra*, 16 Cal.App.5th at p. 259.) The court later opines that accepting Drew's argument "no one told him he had" a claim would eviscerate the good-cause standard. (*Drew*, at p. 259.) But despite their surface similarities, Drew's argument is very different from O'Day's because Drew himself knew about the TSRA, and therefore could have taken steps to ascertain whether he had a claim under it. Accepting Drew's claim would have undermined the requirement for objective reasonableness. By contrast, O'Day did not know about the relevant statute *and* was led astray by the advice he received when he did discuss with counsel "what [he] could do about the record of [his] arrest." A finding of good cause in O'Day's case would not "functionally eliminate the legislatively prescribed limitations period." (Maj. opn. *ante,* at p. 13, fn. 4.) It would give full effect to the legislative directive that we consider on the merits a claim that is more than two years old *if* the age of the case does not prejudice the prosecution and there is a good reason the petitioner did not file earlier. (§ 851.8, subd. (l).)

---

[1] O'Day's declaration states he was arrested at the age of nineteen and represented by private counsel his family retained (with funds received as a result of his brother's death in the Iraq War). O'Day reports meeting with his lawyer the day after his release from custody to discuss issues including what he could do about the record of his arrest, but he reports no interaction with this lawyer after receiving counsel's advice. When, years later, he learned of the possibility of a petition for factual innocence, O'Day approached Legal Aid and was referred to the Sonoma County Public Defender's Office. The reasonable inference I draw from these facts is that he was unrepresented on the factual innocence claim until the public defender agreed to take his case.

As for whether the trial court abused its discretion in finding no good cause here, I see legal error in the trial court's failure to consider whether O'Day's inaction was objectively reasonable. (See *People v. Superior Court* (*Humberto S.*) (2008) 43 Cal.4th 737, 746 [trial court abuses discretion when ruling rests on legal error].) Instead, the court found no good cause because nobody counseled O'Day "he *could not* file such a petition," there was no "legal impediment or barrier" preventing him from filing one, and no circumstances "such as incarceration or medial inability" rendered filing a petition impossible. All true, but in my view, this set of reasons sets the bar too high. A petitioner should not have to show some impediment made it virtually impossible for him to have filed earlier. He need only establish good—i.e., objectively reasonable—cause for his delay. The trial court noted there were embarrassing incidents over the years that "would have served as inspiration to seek relief." (See also maj. opn. *ante,* at p. 11, fn. 2.) But strong motivation to file sooner means nothing if O'Day had no reason to believe a remedy might be available.

A factual innocence petition is, by its nature, filed by someone alleging he or she was the victim of a mistake made in our criminal justice system. The petition does not seek to overturn an existing conviction, but merely to protect the successful petitioner from further consequences for that mistake. In this context, I would not define "good cause" so narrowly as to make timeliness harder to prove in a petition for factual innocence than it is in a petition for writ of habeas corpus. For the decade-long period during which O'Day was unrepresented, he neither knew nor "reasonably should have known . . . the legal basis for [his] claim." (*Robbins, supra*, 18 Cal.4th at p. 780.) I would, accordingly, find the trial court abused its discretion by charging this period against O'Day in determining the timeliness of his

6

petition.  Whether O'Day's petition was untimely for other reasons, since it was filed almost two years after he learned of the possibility of a petition for factual innocence, or whether the trial court was correct in denying O'Day's petition on the merits are issues on which I express no opinion.

TUCHER, P. J.

7

Superior Court of Sonoma County, Mark A. Urioste, Judge.

Walter K. Pyle & Associates and Walter K. Pyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Moona Nandi and René A. Chacón, Deputy Attorneys General, for Plaintiff and Respondent.